Swan, District Judge.
This suit is brought by the owner and insurers of the schooner John Sherman to recover for the loss of that vessel, which was sunk by collision with the steamer Olympia, in the Detroit river, about 4 o’clock p. m. of May 8, 1891. The Sherman was in tow and next astern of the steamer Lowell, which had also in-tow, astern of the Sherman, the schooner Roberts. The Lowell and her consort, all lumber laden, were bound from Cheboygan, Mich., to Toledo, Ohio, and were running about eight miles per hour at the time of the collision. Their course down the river took them well on the Canadian side of mid-channel, or about one third of the width of the river from the Canadian channel bank, and at the time of the collision the Lowell and her tow were below Walkerville, Ont., which is about one and a quarter miles above the foot of Woodward avenue, Detroit. The Detroit river at the place of collision is about half a mile wide.' Neither vessel of the tow was carrying sail. The Olympia, a steamer of 2,000 tons (gross) register, 276 feet long, and 41 feet beam, drawing 14 feet 2 inches, laden with 1,850 tons of coal, and bound from Cleveland to Duluth, came up the river on the usual course until she had founded Sandwich point, below Detroit, when, for the purpose of picking up the marine reporter, she edged over towards the American side, passing Woodward avenue at reduced speed, about three or four lengths from the Detroit dock line, or about as far from the American side as the Lowell and her tow were from the opposite bank. Just after passing outside the revenue cutter Fessenden, which lay a few hundred feet above the foot of Woodward avenue, the marine reporter’s line was cast off, and the “ All right ” signal was given to her engineer, and the Olympia put at her accustomed full speed, about 10 miles per hour. When this signal was given, she was heading up the river, having Belle Isle a little on her starboard bow. To put her on her course to pass up the Canadian channel to the eastward of Belle Isle her wheel was ported, and she swung until she had brought Belle Isle on her port bow. When this was accomplished, the Olympia and Lowell had not quite got abreast of each other. The Olympia was then heading under the stern of the Eoberts, the Lowell’s second vessel. To preserve this course, and to check the swing of the steamer, her wheel was starboarded, but failed to break her swing. Seeing this, her master ordered it hard astarboard, in obeying which the tiller rope slackened on the barrel of the wheel, indicating unmistakably that the steering gear had given way by the breaking of the tiller rope. This was seen by the master of the Olympia from his post on top of the pilot house, just as he gave the order to hard astarboard. He at once signaled to the engineer to stop and back, which was promptly done, and instantly followed those orders by *987 sounding three or four alarm signals to the Lowell and her tow, which were then three or four lengths of the Olympia away. The effect of reversing the Olympia was to swing her stern to port and her bow to starboard. Laden as she was, her headway was such, despite the power of her engines working astern to their full capacity, as to carry her across the current, until, stem on, she struck the John Sherman, which was about 500 feet astern of the Lowell, on the starboard side, between the main and mizzen rigging, cutting into her four or five feet, the force of the blow lifting the port side of the schooner, springing her deck, and throwing her masts out of line. The wheel of the Sherman was put hard astarboard upon the Olympia’s alarm whistles, but her position in the tow prevented any effectual maneuver to get out of the way. The answer of the claimant charges the Sherman with contributing to the collision by neglecting to make due effort to avoid the Olympia, when apprised of her helpless condition, either by swinging off to port, or by casting off her towline, but the proof is satisfactory that, placed as she was, the Sherman was as helpless as the Olympia, and that such effort as was possible was made to escape. The collision was indeed inevitable when the Olympia’s tiller rope parted.
The Olympia was built in 1889, and had been running less than two seasons at the time of this disaster. She was equipped with a steam steering gear of the most approved pattern, and her tiller rope was of charcoal iron wire, one inch in diameter, the size employed on steam vessels of her tonnage. She had also a hand wheel, and was provided with relieving tackles, adjustable to the tiller in from three to five minutes. The ordinary full watch on deck and at the engines were in charge of her navigation, and their competency is unquestioned. The faults alleged against the Olympia are:
“(1) In not keeping her course, and passing the said schooner and the tow, in which she was on the port side, and as she might safely have done, and in leaving said course, swinging to starboard, and towards said schooner and said tow. (2) In not promptly stopping, reversing, or checking her speed after she had turned towards said tow, and when she was approaching said schooner, so as to involve risk of collision. ”
The answer, among other defenses, charges that the Sherman was weak and unseaworthy, and that the consequences of the collision were in large part owing to her condition, and not to the force of the impact. The main defense is that the collision—
“Was caused by unavoidable accident, which could not be foreseen, and against which human prudence could not guard; that the cause of the stéering gear failing to work was ascertained to be the breaking of the wire wheel rope aft on the starboard side; that it was a wire rope, of suitable and ample size, which had been bought at a price which should have insured the best material, and was sold and represented to tne boat as of the best material for that purpose, and was properly rigged and fitted in the most approved manner; that it had been overhauled in Cleveland the day previous to this collision, and her steering gear had been put, so far as human knowledge and ingenuity could do so, in perfect condition; and that, according to a standing rule, the mate had looked over and examined the steering gear, including *988 this rope, before the vessel entered the Detroit river, but a few hours before the accident, on which occasion he found everything apparently in good order and condition.”
The answer further denies all fault, negligence, and omission by the claimant or the officers and crew of the Olympia in her equipment and navigation.
The proofs acquit both the Sherman and the Olympia of the omission of any measure which would have averted or mitigated the collision after the breaking of the latter’s wheel rope. The collision being admitted, the primary inquiry is whether its cause was any defect in the equipment of the Olympia against which due care and skill could have provided. If the defense of inevitable accident is sustained, it will dispense with the necessity of weighing the proofs as to the condition of the Sherman, as a factor in the extent of the damage.
It appears from the proof that on August 26, 1890, the Olympia ran onto the Boston shoals, at the mouth of the Detroit river, and that the accident was caused by the parting of this same tiller rope. The rope was examined, and found to have parted in the starboard forward block, through which it led, and that the break was occasioned by the warping of the block', which was • set in close proximity to the steam pipe leading to the forward part of the boat. The effect of the heat was to warp the block from its proper horizontal position, and thereby the tiller rope, under the power of the steering engine, was brought against the pin of the sheave, and parted. The evidence shows that a single contract of the pin and the wire tiller rope drawn by the steering engine was sufficient to cut it. This break was at once repaired. The chafed portion of the tiller rope was cut out, it was changed “end for end,” and again rove. It was used the remainder of the season,—some three months,—in four or five round trips of Lake Superior, without developing any indication of weakness or defect. On May 7th, the day before the collision, just before departing from Cleveland, the master of the Olympia, for the purpose of bringing into horizontal position the block next to the quadrant on the rudder post, caused a short splice to be inserted in the tiller rope between that block and the block on the starboard quarter. The splicing was done by George Patterson, a competent wire rigger of over 20 jmars’ experience, who had set up this rope on the Olympia when she came out, and he was aided in the work by Bogie, the second mate of the steamer. Speaking of the condition of the tiller rope between the quadrant and the block on the starboard side, (the locality of the break,) Patterson, when asked if in making’the splice he thought to examine the rope as to its fitness for splicing, answered: “No, sir; but if the rope had been bad, I could tell that by handling it. I found out the rope was good, and I spliced it. If I had found the rope'bad, I would not have spliced it.” Bogie testified as positively that it was apparently good, and that he handled it before ' and after Patterson spliced it, and also examined it at the time and place of the break, but could not learn the cause of its parting. Other witnesses concur that there was no defect which could be seen or detected *989 by manipulation. The rules prescribed by the owners of the Olympia required the steering gear to be inspected before entering the river in her route, and, in obedience thereto, the first mate, who died before this suit was brought, was sent by the master to make that examination as the Olympia was approaching the mouth of the Detroit river, about three hours before this collision. The mate reported that he had performed that duty, and found the steering gear “all right.” The rope was produced at the hearing, identified, and inspected by experts, but nothing was elicited, to account for its rupture. The wire was sound, smooth, pliable, without flaws, and of good quality. With the wheel hard over, the forward end of the splice was brought within about a foot of the starboard block aft, no part of the splice traveling on the sheave. The rope parted between the splice and the starboard quarter block. The fag-ends of the break were of unequal length, indicating that the strands had been pulled apart, as if yielding to a violent strain. • The tensile strength of a rope of this diameter varies from 30,000 to 35,000 pounds. The effect of strains is to crystallize and weaken the iron. No indication of crystallization was found. There is nothing in the proof impeaching the quality of the material, or explaining the cause of its rupture. It was purchased from reputable dealers, and manufactured by makers of good standing, who customarily tested their wares before putting them on sale. The proofs agree that its size, material, workmanship, and condition assured.its fitness and adequacy to its use when originally put in the steamer. The service in which the Olympia was employed was not exceptionally severe. The evidence is undisputed that the life of such a tiller rope may be relied upon for at least three, and generally four or five, years of use, though in view of the facts of this case I am inclined to regard the shorter period as the safer limit. The fact that the break was not in the splice, but in the intact, and apparently sound, portion of the rope negatives any suggestion of connection between this and the disaster of the year before at the Boston shoals; especially since the good condition of the gear is confirmed by its subsequent satisfactory service up to the very day of this collision, and by its present appearance. Had the first mishap been occasioned by any defect in the rope, the aspect of the case would have been entirely different.
We must look elsewhere for the cause of this mischance. The Olympia’s steam steerer is worked by double engines of seven horse power, geared to a worm screw. The rapidity with which this force is applied to its work necessarily subjects the tiller rope to violent and severe strains, and the increasing frequency of accidents of this kind to steamers is, in part, at least, chargeable to this powerful and expeditious machinery. Its instantaneous action, though invaluable in sudden emergencies, necessitates the highest vigilance in the inspection and maintenance in perfect order of its connections. The very facility with which .it is operated rarely reminds even the experienced mariner of the necessary effect of a great power, so easily put in motion, upon the connections to which it is applied. The error of giving a vessel too much *990 wheel is corrected apparently by a touch of the hand, but in fact by a power acting with such energy that its effect upon the fabric wrought upon is rarely considered or appreciated. Even with the most competent and experienced wheelsmen at the helm, the great and unavoidable wear and strain of the gear, occasioned by the frequent sharp changes of course incident to the navigation of the sinuous and comparatively narrow channels of the waterways between the Great Lakes, crowned, as they are, with a vast commerce, is so natural and necessary a result of the use of machinery working with such power and celerity that the degree of care and skill required to keep it in safe condition in all its parts would be accounted extraordinary were there less need of it. The propriety of insisting upon this measure of diligence in the use and care of this equipment is manifest. It is not enough to exempt a vessel from the consequences of injury to life and property traceable to the sudden collapse of the guiding power that the material was originally of the best quality, and that its service, dimensions, and workmanship ‘warranted reliance upon its sufficiency, unless these conditions are supplemented by the closest attention to their preservation. Ordinary care and skill are relative terms, limited only by the circumstances which invoke them, and the field for their exercise enlarges with the dangerous character of the agency employed. The same considerations which exact from a vessel propelled by steam the utmost care and circumspection in navigation, because of her speed and power, more forcibly require that the machinery for the control of her course shall be equal t® that end, so far as reasonable care and skill can make and maintain them. If such care and skill are bestowed in their use and preservation, and an accident occurs, the law gives immunity, regarding it as unavoidable. It is urged that the defense of inevitable accident is not one to be favored. It must be confessed that there is a popular prejudice against it. There is a seeming hardship in leaving an injured party, innocent of fault, to bear the consequences of a misfortune, without redress against the person or thing causing the loss by pure fortuity; yet the argument against this defense loses sight of the fact that the imposition of liability for any part of such loss upon one not culpable would not only be a judicial wrong, which shifts the misfortune upon an innocent person, but its .effect would be disastrous to the safety of life and property, by removing a strong incentive to the exercise of care and skill in the conduct of every occupation and business. The courts would then become, not only tribunals for the assessment of damages, without power to inquire into oth'er facts, but instruments of rank injustice. The popular sentiment against absolving a person who without fault of himself or his servants has caused damage to another is as unjust and impolitic as the obsolete law of deodand, which forfeited to the king the animal or. thing which caused the death of a human being. The civil law, the common law, the maritime law, and the law of Great Britain and the United States agree that where a collision takes place by inevitable accident, without blame being imputable to either party, the consequences of the misfortune must be borne by the party upon whom it happens to fall. *991 Pars. Shipp. & Adm. 525, and cases. It is not necessary to this defense that the party proceeded against should have used extraordinary skill and diligence, but simply, “that degree of skill and that degree of diligence which is usually found in persons who discharge their duty.” The Thomas Powell and The Cuba, 2 Marit. Law Cas. (O. S.) 244; The Marpesia, L. R. 4 P. C. 212, and cases cited; The Virgo, 3 Asp. 285; The Pladda, L. R. 2 Prob. Div. 34. “The highest degree of caution that can be used is not required. It is enough that it is reasonable under the circumstances, such as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in view,— the safety of life and property.” The Grace Girdler, 7 Wall, 203; The Mabey and The Cooper, 14 Wall. 204-215. The courts of common law hold the same doctrine, which is well expressed in Bygert v. Bradley, 8 Wend. 473:
“When we speak of an unavoidable accident, in legal phraseology, we do not mean an accident which it was physically impossible, from the nature of things, for the defendant to have prevented. All that is meant is that it was not occasioned in any degree, either remotely or directly, by the want of such care and skill as the law holds every man bound to exercise.”
See, also, Weaver v. Ward, Hob 134; Losee v. Buchanan, 51 N. Y. 476; Bizzell v. Booker, 16 Ark. 308; Morris v. Platt, 32 Conn. 75; Brown v. Marshall, 47 Mich. 576, 11 N. W. Rep. 392; Gault v. Humes, 20 Md. 297; Morgan v. Symonds, 1 Jur. 137.
Tried by this rule, it is clear that the claimant has established hisdefense. Every practical precaution seems to have been taken to forefend this casualty. Its occurrence may, with equal reason, be referred to a sudden and extraordinary strain, which is the theory of masters of experience, or to a latent undiscovered defect in the rope, or the co-operation of both these causes. Whether occasioned by either or both, it was inevitable. The claimant had a right to assume that the reputable ship chandlers from whom the tiller rope was bought were competent and careful dealers, and had used due care in their purchases; and also that an article of such vital importance to the safety of a steam vessel, made by manufacturers of good standing, might be relied upon as adequate to the purpose for which it was designed, especially when it had withstood the proper test. Its use and service approved the claimant’s judgment. There was nothing to indicate weakness, though its condition was carefully observed. Consequently, no negligence in its use is shown. Railway Co. v. Huntley, 38 Mich. 547; Readhead v. Railway Co., L. R. 4 Q. B. 379; Daniel v. Railway Co., L. R. 5 H. L. 45; Richardson v. Railway Co., 1 C. P. Div. 342.
Nor does the evidence sustain the imputation of fault founded on the failure to use the relieving tackle. There was no time to bring that appliance into use. It is not intended for use in emergencies demanding prompt action, nor for the navigation of a large steamer in a narrow channel, but it is a temporary steering gear, to be hooked to a tiller in bad weather, as a safeguard against the consequences of the breaking of the tiller rope, or as a substitute for it, when broken, until it can be *992 repaired. The master of the steamer testifies that it could not have been hooked on ready for use under three to five minutes, while less than three minutes elapsed from the discovery of the break until the collision. The fact that the injury has befallen the libelants without fault on their part, and they are the only sufferers, has naturally invited a close scrutiny of the defense; but the proofs fail to disclose any grounds for the condemnation of the Olympia. The loss must rest where it has fallen, and the libel must be dismissed.
The circumstances under which the collision occurred justified the libelants in bringing suit for their loss, as only judicial inquiry could have elicited the evidence which has exonerated the Olympia. If it had appeared that an equally full showing of the proofs in her defense had been made prior to the filing of the libel, I should have followed the American rule, and allowed costs to the claimants, but, under the circumstances, no costs will be allowed.