### THE LACKAWANNA.

#### (District Court, W. D. New York. January 2, 1913.)

1. COLLISION (§ 41*)—ACTION FOR COLLISION—INEVITABLE ACCIDENT—BURDEN OF PROOF.

   The burden of proof rests upon a vessel which, by a sudden sheer, brought about a collision with a passing vessel to establish the defense of unavoidable accident by showing the cause of the sheer, and that it was unavoidable, or all the possible causes, and that none of them could have been avoided.

   [Ed. Note.—For other cases, see Collision, Cent. Dig. § 41; Dec. Dig. § 41.*]

2. COLLISION (§ 39*)—SHEERING OF PASSING VESSEL—INEVITABLE ACCIDENT.

   When the steamer Lackawanna, downbound through the St. Clair river, was passing a meeting steamer with a barge in tow she suddenly sheered and came into collision with the barge. The sheer was caused by the disablement of her steering gear, due to the loss or breakage of two bolts. The bolts could not afterward be found, so the cause of their loss was not ascertainable; but the steering apparatus was of a type in general use, and it was shown that it had been overhauled three years before, and inspected by both the captain and chief engineer within a month, and found apparently in good condition. *Held*, that on such evidence there was no failure to exercise ordinary skill and care which rendered the vessel liable for the collision, but that it must be attributed to unavoidable accident for which she was not liable.

   [Ed. Note.—For other cases, see Collision, Cent. Dig. § 39; Dec. Dig. § 39.*]

In Admiralty. Suit by the Davidson Steamship Company, owner of the barge Chieftain, against the steamer Lackawanna, the Buffalo Transit Company, claimant. Decree for respondent.

Goulder, Day, White, Garry & Duncan, of Cleveland, Ohio (Harvey D. Goulder, of Cleveland, Ohio, and O. D. Duncan, of counsel), for libelant.

Brown, Ely & Richards, of Buffalo, N. Y., for claimant and respondent.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

HAZEL, District Judge. On September 18, 1909, shortly after 11 o'clock in the forenoon, the freight steamer Lackawanna, 270 feet in length, beam 40 feet, laden with flour and copper, collided in St. Clair river with the barge Chieftain, which, with another barge in her wake, was being towed by the steamer Shenandoah, upbound, on a voyage from Lake Erie to Duluth. The steamer Lackawanna was downbound. Near the rapids at the upper end of the river, she blew a passing signal to the Shenandoah, which was promptly answered; both steamers continuing on their courses and passing starboard to starboard at a distance of from 100 to 200 feet. As the Lackawanna was passing the afterpart of the Shenandoah, she suddenly deviated from her straight course and sheered into the steel cable, 600 to 700 feet in length, by which the Chieftain was being hauled, and, after breaking it, struck her at a point about 90 feet from the steamer's stem. The day was clear and bright, and there was no wind. The Lackawanna's wheel, preceding the collision, was slightly to port, and on the instant the order was given the wheelsman to starboard a little the steering gear broke, and she rapidly sheered to starboard and into the Chieftain.

The libelant attributes to the Lackawanna the entire fault for the collision, claiming that the steering gear was insufficient and improper, a condition which was known to the respondent, and one for which it must be held solely to blame. The respondent denies the commission of any negligent act, claims that the defect in the steering gear could not have been foreseen, and charges that the Chieftain was not wholly impeccable for the disaster. But the evidence establishes that there was nothing that the Chieftain could have done to avoid the accident, as there was not sufficient time between the time of the departure of the Lackawanna from her course and the collision for the former to let go her hawser; indeed, there was barely time for the seamen standing by to save themselves. It is not shown that the barge, when the unexpected sheer of the Lackawanna was first observed, did not exercise reasonable care to avoid the disaster, or to mitigate it. Even if she were accusable of some lack of promptness or failure to exercise accurate judgment, she could not in so unexpected an emergency become such a contributor to the collision as to justify holding her liable for damages (The Ohio, 91 Fed. 547, 33 C. C. A. 667); and hence it is thought unnecessary to further consider the testimony introduced to show fault on her part.

[1] The principal questions presented at the bar as to whether the divergence of the Lackawanna from her course owing to the jamming of the steering engine was attributable to her negligence, or whether her plea that the accident was inevitable is sustained within the rule enunciated by prior adjudications under substantially similar circumstances, may now be taken up. The sheering of the Lackawanna from her course was prima facie an omission of a plain duty, after exchange of passing signals, to properly navigate, and a heavy obligation rests upon her to explain and excuse her conduct. In The Edmund Moran, 180 Fed. 700, 104 C. C. A. 552, the Circuit Court of Appeals for the Second Circuit approved the doctrine announced by Justice Fry in the case of The Merchant Prince, 1 Prob. Div. 179 (1892), wherein it was

substantially held that the burden rests upon the respondent to show unavoidable accident, and that to sustain such burden all possible causes must be shown which could have produced the effect, and as to all such possible causes it must be shown that the result could not have been avoided. The important questions then are: Has the respondent in its plea of unavoidable accident shown the causes of the accident? Has it shown that the result or the cause was unavoidable, and has the burden resting upon it been met by showing all the possible causes that could produce the effect, and as to each that it was impossible to avoid the result by the exercise of ordinary care?

[2] The respondent has proven that the Lackawanna suddenly and without warning deviated from her course because the journal caps, which held the idler shaft and sheave in place, dropped down owing to a loosening thereof, and that from each iron strap one of two bolts had fallen, or had been removed, causing the dislodgment of the idler shaft, which dropped down and disabled the steering gear. Was the failure to see that such an act might happen an act of negligence on the part of the Lackawanna? If, by the exercise of ordinary care, the occurrence could have been anticipated, it was her duty to take such precaution to prevent the accident as the situation warranted. The Olympia (D. C.) 52 Fed. 990; The Grace Girdler, 7 Wall. 196, 19 L. Ed. 113; The European, 54 Law J. Adm. 61.

The libelant contends that, as it is extremely unusual for a steering gear to break, the cause of the accident has not sufficiently been shown by respondent to excuse it from responsibility on that ground; nor have the possible causes which produced the effect been shown or excused, nor has it been shown that such causes, by the exercise of reasonable care, could not have been avoided. The proofs show that the Williamson steering engine, which was used on board the Lackawanna, was about 20 years old, but was of a type extensively used by the older steamers plying the Great Lakes. In such type of steering engines the bed-plates are ordinarily constructed in such a way as to support, under the deck, the fair leader and stationary shaft; while the chains usually run to the deck and extend to the wheel. Though the steering engine in controversy had had considerable use prior to the accident, there had been no previous trouble, nor any indication of defect in the engine or in the caps or bolts. Three years before the disaster the steering engine was taken off the steamer into a machine shop, where it was overhauled, and then replaced and refitted. Whether new plates and bolts were put in is not positively shown; but it is quite presumable that either new bolts were used, or that the old ones were examined and found to be without weakness or flaw.

The libelant does not believe that the mishap occurred through the unavoidable dropping out or breaking of the two bolts which practically held the idler shaft in its socket, and points to respondent's failure to produce such bolts for examination and inspection. It is argued that inspection of these end bolts would doubtless have disclosed the improbability of the occurrence of an unavoidable accident

through any such medium. To this contention the respondent rejoins that the nonproduction of the bolts was entirely due to the fact that they were not in place at the time of the mishap; that they had previously dropped out and were missing; and that in some unaccountable way their displacement had not been discovered. It is pointed out that the master of the steamer Lackawanna and her chief engineer looked over the steering engine an hour after the accident, not deeming it advisable to change the position of the bedplates save in the presence of the owner or underwriter; that neither the first mate, the engineer, nor the oiler saw the bolts, though a search was afterwards made for them around on the deck and underneath, where the bracket was placed. While the testimony relating to the failure to produce the bolts is not entirely satisfactory, yet it is thought impossible to impute negligence to the respondent upon the mere absence of the bolts, especially as the two bolts were not only missing, but were not afterwards found or seen by any of the witnesses interrogated in relation to their absence. It is true the missing bolts may have been in a state of crystallization, or they may have been incrusted with rust, or they may have had their usefulness impaired in some other way, yet such condition is not to be assumed upon surmise or conjecture based merely on their nonproduction, in the absence of evidence indicating a designed or intentional concealment thereof.

The next possible cause of the accident in relation to which evidence was produced is the asserted failure to properly inspect the steering gear. Captain Rolseng of the Lackawanna testified that he went aboard the steamer on August 21, 1909, and at Gladstone took a quarter turn out of the chain on the drum; that he returned to Buffalo and afterwards proceeded to Duluth; and that on the return trip the accident occurred. At Duluth he examined the chains to find whether or not they were taut, and tested them by turning the wheel hard over both ways. It was his custom, he testified, to take frequent notice of the chains to ascertain their condition. Before leaving Buffalo, he had rigged the chains from a cross-chain to a straight-chain steerer, and to such change reference will hereinafter be made. It is shown that Chief Engineer Stone made an inspection of the steering gear in the latter part of August, and, observing that the iron straps at the end were down about one-sixteenth of an inch, examined the heads of the bolts, not only with his fingers, but applied a monkey-wrench thereto, and found them solid. Nothing at the time of the inspection caused him to believe that injury would result to the bolts from his method of inspection; but assuming that while lying on his stomach to turn the bolts to bring the straps closer to the frame he, without being aware of it, by the use of such force did impair their usefulness, his acts in that regard would not be deemed acts for which the respondent is liable. His competency as an engineer is not questioned, though his unfamiliarity with the construction of this particular steering gear is claimed to have rendered him incapable of giving proper supervision. But of this I am not convinced. He carefully and painstakingly inspected the caps and bolts, and the fact that he

was surprised at not finding the bolts holding the caps snug to the frame does not militate against his competency. The engineer swore also that at every watch he examined the steering gear, and satisfied himself that everything pertaining thereto was in order; while the oiler twice each day, in compliance with his duty, oiled the same, including the shaft. Nothing was detected on any of these occasions to give warning of any defect or flaw. It is true that at such times the bedplates and bolts were not tried by striking or testing; but such inspection was not demanded, as the bolts and idler shaft were in a place where they could not be easily observed. In Van Eyken v. Erie R. R. Co. (D. C.) 117 Fed. 712, the evidence showed that there had never been an inspection of the set screw which loosened and disorganized the steering gear; while in this case, as already stated, the bolts and journal caps were inspected three weeks before the accident. Again, it is true that the shaft was found bent after the collision, yet, on the other hand, the evidence is susceptible of the inference that its bent condition was due to its precipitation or jamming into the engine, and not to the fact that the shaft was in a bent condition prior thereto.

Next, it is urged that Captain Rolseng negligently rigged the vessel from a cross-chain steerer to a straight-chain steerer, and in navigating her thereby caused an undue strain to be put upon the journal caps and bolts, which resulted in loosening them. Much testimony was adduced on this asserted possible cause of the occurrence, and in libelant's brief the utmost importance is attached thereto; it being contended that the resultant thrust of a cross-chain steerer is 30 degrees from horizontal, while that of a straight-chain steerer is 45 degrees, accompanied by a lateral strain which would probably loosen the journal caps or brackets. After a careful examination of the testimony of the expert witness Williamson and the other testimony relating to this phase of the case, I conclude that the method of positioning the steering engine in the Lackawanna was not defective or impracticable, and that the steering engine was intended and designed for use on said steamer with either straight or cross chains. According to the evidence it made no material difference whether the steering was by straight or cross chains; and that there was a difference in the degrees of thrust was likewise unimportant, and did not contribute to the loosening of the journal caps which held the shaft in place. Upon this point the evidence also shows that Captain Rolseng had himself crossed the chains between the drum and sheave for straight steering; that he had had extensive experience in adjusting such chains; and, furthermore, that every Williamson steering gear with which he was familiar used the straight chains for steering.

It is finally urged that loose rudder chains and the consequent shock or jolting possibly caused a gradual loosening of the caps and bolts, causing the shaft to drop down and affect the steering; but it is sufficient to state that there is nothing in the record to justify the conclusion that the accident was the result of such a cause. Taking the evidence in its entirety, I think the sole cause which produced the

collision was the dropping out of one of the bolts from each strap (each strap having two bolts), as a result of which the idler shaft jammed into the engine. What caused the release of the bolts it is impossible to state. While it may be surmised that the engineer in testing them wrenched them too hard, or that they were not flawless, still, in any event, there is nothing to justify holding that the accident happened because of the negligence of those having charge of the navigation of the Lackawanna. There was no impairment in the vessel's construction or equipment. Her method of carrying the steering engine in these modern days, perhaps, would not receive the approval of builders and designers of the larger vessels for the lake carrying trade, but her steering engine and the position thereof compared favorably with that of other vessels of her type. Such being the fact, the happening of an accident on account of a defect which, by reason of her construction and equipment, was latent, and which could not by reasonable inspection be discovered, comes within the category of inevitable accidents for which there is no liability on the part of the owners of the vessel for injury sustained by another vessel. The Lizzie Frank (D. C.) 31 Fed. 477; The Olympia, 61 Fed. 121, 9 C. C. A. 393.

As to each possible cause suggested at the hearing, the respondent has fairly shown, I think, that the effect could not have been avoided by the use of such ordinary care, skill, and diligence as the admiralty law requires. Hence as to each such cause the effect was unavoidable and the collision inevitable. While it must be admitted that this disposition of the controversy leaves the libelant, a noncontributor to the disaster, to bear alone the heavy consequences of the accident, and also holds the steamer which caused the damage blameless, yet, as such mishap was unavoidable, there can be no recovery. The rule was well stated by District Judge Swan, in The Olympia (D. C.) 52 Fed. 990, as follows:

"The civil law, the common law, the maritime law, and the law of Great Britain and the United States agree that where a collision takes place by unavoidable accident, without blame being imputable to either party, the consequences of the misfortune must be borne by the party upon whom it happens to fall."

For the foregoing reasons the libel is dismissed, but without costs.