## THE CENTURION.

### PEREUE et al. v. HOPKINS S. S. CO.

(Circuit Court of Appeals, Sixth Circuit. March 15, 1900.)

No. 731.

COLLISION—SUIT FOR DAMAGES—FAILURE OF EVIDENCE TO SHOW FAULT.

The steamship Marshall, having, with her load, a displacement of about 1,234 tons, was passing down the St. Clair river, when she was met by the Centurion, having a displacement of about 7,500 tons, which was passing up. When the stems of the two vessels were about opposite, and they were apparently passing in safety, the Marshall suddenly sheered, and her stem struck the Centurion on the port side, near the stern. The channel was from 1,200 to 1,500 feet wide, and the water from 4 to 5 fathoms deep, at the place of collision: and the Marshall was as near the American shore as it was deemed safe to go. Each vessel was moving at a speed of 7 or 8 miles an hour. There was no proof of the mismanagement of either vessel which could have caused the collision. *Held* that, while it was possible that the suction of the larger vessel caused the sheer of the smaller, it was not clear that such was the fact, or that such effect was reasonably to be apprehended, so as to render the Centurion negligent in passing so close to the Marshall, and that the latter could not be charged with fault, in view of the uncontradicted testimony of proper management, but that the case was one in which the evidence failed to establish the negligence charged by either party against the other, or to show the cause of the accident.

Appeal from the District Court of the United States for the Eastern District of Michigan.

This case presents cross appeals from a decree in admiralty of the district court for the Eastern district of Michigan. On the early morning of August 25, 1898, between 2 and 3 o'clock, a collision occurred in the St. Clair river between the steamers J. D. Marshall and Centurion. The collision occurred at a point near a place called "East China," some distance above Ricord's Dock, between Marine City and St. Clair. The night was dark, but, at the time of the collision, clear, with little wind. The Marshall was bound down. She was a vessel of about the length of 169 feet over all, 33½ feet beam and 12 feet deep, of a gross tonnage and approximate weight of 534 tons. She was laden at the time with about 600,000 feet of lumber. She drew 11 feet forward and 12 feet aft. The cargo is said to have weighed 700 tons, and the total displacement of the Marshall to have been 1,234 tons of water, or 39,800 cubic feet. The Centurion was of the length of 378 feet over all; beam, about 45 feet; depth, 22 feet. She was laden with coal at the time. Her gross tonnage and approximate weight are said to have been 3,402 tons; her cargo, 4,100 tons; and her total displacement, 7,502 tons of water, or 242,000 cubic feet. She drew 16 feet 2 inches aft, and 16 feet forward. When the vessels were probably three-quarters of a mile apart the Marshall blew a signal of one blast, which was answered by a like signal from the Centurion. The channel at this point of the river is from 1,200 to 1,500 feet wide, and the water at the place of collision from 4 to 5 fathoms deep. The Marshall was coming down pretty near the American shore. Owing to the darkness of the night, just how near is not readily ascertained. When the vessels sighted each other the Centurion was on a course which would have probably carried her considerably further towards the Canadian shore than she was in fact at the time of the collision. After the signals were interchanged the Marshall drew a little closer in towards the American shore, and as close as the master deemed it prudent to go. About as the stems of the vessels were lapping, the Marshall suddenly sheered, and with her stem and port bow struck the Centurion at a point on her port side 90 feet from her stern. When the Marshall commenced to sheer, the Centurion's wheel was put a trifle to port, and when the collision became certain her wheel was put hard a-starboard. From the testimony it is probable that the Marshall

was going just before the collision at about the rate of 7 or 8 miles an hour; the Centurion, at half speed, which would be a little slower than the Marshall was going. No danger signals were sounded, and neither officer in charge apprehended any danger until the sudden sheer of the Marshall. The district judge dismissed both the libel and cross libel, holding that the proof failed to make out a case for either party against the other; that neither party was shown to be in fault by that degree of testimony which would be necessary to affirmatively establish the claim of the one against the other. The learned judge observed that the case was as near one of inevitable accident as could well be imagined. Both parties appealed. On behalf of the Marshall the assignments of error are summed up as follows: "First, the collision was not due to inevitable accident; second, the collision was primarily due to the Centurion, with her large displacement, being wrongfully placed by her officer in charge in such a situation that her suction swung the Marshall from her course; third, the Centurion was in fault for porting instead of starboarding her wheel when the sheer came." On the part of the Centurion it is claimed that the case is one in which the Marshall should have been held, for she left her course and ran into the Centurion. It is also claimed that the Marshall has not been exonerated by proof excusing the sheer, and that the testimony shows that proper skill and seamanship by those in charge of the Marshall would have avoided the accident. It being further claimed that the Centurion performed her full duty, a decree is asked in favor of the cross libelant.

John C. Shaw, for appellants.

George Clinton, for appellee.

Before TAFT, LURTON, and DAY, Circuit Judges.

DAY, Circuit Judge (after stating the facts as above). The theory upon which the owners of the Marshall seek to hold the Centurion liable for the collision and its resulting damage is that the Marshall, observing all the requirements of good seamanship on her part, was drawn from her course by reason of the suction of the Centurion passing at a high rate of speed so near to the Marshall as to cause the latter to be strongly deflected from her course, and, by a sudden sheer, which the Marshall could neither prevent nor check, caused to collide with the Centurion. The nature and power of the somewhat undefined force known as "suction" is not very well settled among navigators, nor its limitations defined with exactness by the courts. That such a force exists is well established, and to it have been ascribed marine disasters in a number of instances. In other cases it has been held insufficient to warrant a court in attributing to it the power required to seriously deflect vessels from their course. The authorities seem agreed that much depends upon the character of the place of meeting. This force is most potent in narrow channels and shallow waters. It is much more likely to produce injury to vessels passing in the same direction than to those meeting on opposite courses. A large vessel may affect a small one by this means, when those of equal dimensions would pass in safety. In the case of The City of Cleveland (D. C.) 56 Fed. 729, the nature and power of suction were under consideration by Mr. Justice Brown, then district judge. The case was heard before Judge Brown and four nautical assessors. It was claimed that the City of Cleveland, in proceeding at a high rate of speed and passing too near to the Keweenaw, had created a suction which drew the Keweenaw into the tow of the Cleveland. Judge Brown, though at first in-

clined to dispose of the case as one of accident occurring through inscrutable fault, joined with the assessors in holding that the accident was the fault of the Keweenaw. There was testimony tending to show that the man at the wheel of the latter vessel turned his wheel the wrong way. The wheel chains of the Keweenaw were not crossed, but straight, and the confusion in the wheelman's testimony led the court to resolve the doubt in favor of the Cleveland; Judge Brown saying that, if the wheel had been promptly put to starboard, there would have been no danger from the suction of these passing vessels. He says:

"The testimony given yesterday, and the experience of my Brethren here, lead me to believe that the suction of two vessels passing each other is not very powerful. It is too short to have any particular effect upon the action of the two vessels, unless one is much larger than the other, whereas, if they are going in the same direction, and passing near each other, it has a very powerful effect to deflect the weaker vessel from her course. If one of these vessels had been very large, and the other comparatively small, it is possible the suction would have had some effect."

In the case of The Alexander Folsom, 3 C. C. A. 174, 52 Fed. 412, Judge Jackson (afterwards Mr. Justice Jackson), delivering the opinion of the court, after citing the observations of Judge Brown in the case of The City of Cleveland, says:

"The theory of suction in meeting and passing vessels is that the current which rushes in astern to fill the displacement of water caused by the larger or more rapidly moving vessel has a tendency to draw the other out of her course when her bow comes within its influence. When it is considered that such current has its direction in the line of the moving vessel, with its greatest force and strength directly astern, its lateral bearing as a drawing and diverting influence cannot, as suggested by Judge Brown, be very powerful. Whatever may be its force, it is clear, from the testimony and from reason, that the smaller vessel is most liable to be affected by it. A relatively greater speed on the part of the smaller vessel may counteract such influence, and may even deflect to some extent the larger vessel, if her speed is sufficiently in excess."

The testimony in this case tends to show that witnesses residing along the shore and near the place of collision had observed that the Centurion, in passing, "splashed" waves upon the shore, and that a small boat had been broken by the effect of the waves, and small docks and boat houses carried away. Particularly was this the effect of the Centurion when running fast and near to the shore. The captain of the Marshall attributes the cause of the collision, from want of other cause, to the suction of the Centurion. Instances are given where the Centurion is shown to have washed waves upon the bank five or six feet. It seems that the Marshall was drawn from her moorings by a passing steamer at Marine City. The captain of the Centurion says the Centurion displaces considerable water along the bank. "As she goes ahead, she naturally throws a good deal of water up ahead of her. She will throw that on the bank ahead of her a little ways; and then as you get back along amidships she will pull it down, and as the stern comes along, and the water goes out from under her stern, it will pull it back again, and comes up to its natural stage, or probably a little further than its natural level." Other testimony is given to show the effect of suction under various circumstances. We do not find in

the record any instance of vessels passing in the relation which the Marshall and Centurion are shown to have been just prior to the collision where accident has resulted from force of suction. As the facts show, the channel at this point was deep and wide, and we are not able to say from the proof that suction alone could have produced this collision.

Again, the liability of the Centurion depends upon the answer to the question whether she used all the care and diligence which were reasonably incumbent upon her to avoid injury. The Drew (D. C.) 22 Fed. 852. Conceding that the suction of the Centurion had much to do with the drawing of the Marshall from her course, the testimony does not satisfy us that, under the circumstances, this force might be reasonably apprehended on the part of the navigators of the Centurion to thus seriously and suddenly affect the course of the Marshall so as to produce the collision in the manner shown in this case. The Centurion, it is true, might have kept a course further out into the river towards the Canadian shore, but she was passing in safety when the Marshall suddenly sheered from her course. From the testimony we cannot say that this force was the sole cause of the collision, or that its action in the manner shown could have been anticipated by the Centurion in the exercise of the care required under the circumstances. When the passing vessel has no reason to apprehend danger, she is held not to be responsible for such injuries as arise from ordinary navigation. Id. 855.

It is further charged against the Centurion that she was negligently navigated when the sheer came, in porting instead of starboarding her wheel. This maneuver was made in extremis, when the peril was imminent, and almost immediately the wheel was starboarded so as to throw the stern of the Centurion away from the Marshall. We do not think this action culpable on the part of the Centurion.

Was the Marshall in fault? There is not in this case, as was the fact in the case of The City of Cleveland, supra, any direct proof of mismanagement on the part of the wheelsman. The testimony of her officers and crew is clear and distinct that the wheel was properly managed. It is quite likely, from the testimony, that the Marshall could not have been deflected by her wheel alone to the change of course which resulted in the collision. It is possible that her wheel was improperly managed, notwithstanding the contrary testimony, so as to assist in the sheer, or fail to avoid the effect of suction, as might have been done with proper management. But this case, like others, must be decided upon testimony, and not upon conjecture. As we have said, there is no testimony, except what might be inferred from circumstances, tending to show that the Marshall's wheel was improperly handled. There is nothing in the case which, in our judgment, can overcome the positive testimony of the navigators of the Marshall. As to her course, she was well over on the American shore, and so near that the master deemed it imprudent to go closer. The case seems to be, if not strictly an accident occurring through inscrutable fault, one wherein there is a failure of proof to establish the negligence charged by one party against the other. This was the conclusion reached by the learned

judge who heard the case in the district court. Finding no error, the decree is affirmed; each party to pay costs by them made, respectively.