## THE FONTANA.

### (Circuit Court of Appeals, Sixth Circuit. January 6, 1903.)

### Nos. 1,110, 1,111.

1. COLLISION—VESSELS WITH TOWS MEETING—SUCTION DUE TO OVERTAKING STEAMER.

The Interocean, an overtaking steamer, attempted to pass another steamer having a barge in tow going up the St. Clair river, but the towing vessel refused to assent to her signals, and she desisted, but kept alongside of the barge for some time, but at a safe distance, at no time less than 100 feet, until the towing steamer was passing a meeting vessel, also with a tow, when the Interocean swung in toward the barge, and within from 30 to 60 feet, and almost immediately the stern of the barge swung to port, and she sheered to starboard, striking and sinking the passing tow, which was on a course 150 feet distant. Up to that time the barge was following her steamer closely, and was under a starboard wheel, to counteract the effect of the current, which was put hard astarboard as soon as the sheer was felt. No fault in the management of the barge was shown. Held that, while she had the burden to clear herself from fault in the deviation from her course, she did so when she showed that she was following her steamer, and was in the exercise of due care, and that she used all reasonable means to break the sheer; that under the facts shown the sheer must be attributed to the suction caused by the Interocean, and she must be held solely in fault in failing to keep at a safe distance, taking into account the danger from suction, as was her duty as an overtaking vessel.

2. SAME—TOTAL LOSS OF VESSEL—MEASURE OF DAMAGES.

Where a vessel is sunk in collision, and damages are awarded on the basis of her total loss, including interest on her value and her pending freight, the owner is not entitled to damages for loss of future earnings under an unexpired charter.

---

¶ 2. See Collision, vol. 10, Cent. Dig. § 282.

Appeals from the District Court of the United States for the Eastern District of Michigan.

The barge Fontana came into collision with the barge Santiago and was sunk almost instantly, the loss being practically total. The Fontana was bound down the St. Clair river in tow of the steamer Kaliyuga. The Santiago was bound up the river in tow of the steamer Appomattox. The collision occurred near the mouth of the river, a little below and nearly abreast of the Fort Gratiot light, and slightly on the Canadian side of the range line. The channel is at that point about 1,100 feet wide, the sailing range running about 500 feet from the American shore line. The current at the point of collision is very stiff, running between four and five miles per hour. The mouth of the river is funnel-shaped, and the current flows in from either side toward the center, but at the point of collision it follows substantially the range line, with a slight trend toward the American shore. The Kaliyuga was 269 feet long and 40 feet wide. The Fontana was 231 feet long and 39 feet wide, and was on a tow line about 800 feet long. The Appomattox was 319 feet long and 42 feet wide. The Santiago was 324 feet long and 45 feet wide, and was on a tow line of about 900 feet long. All were heavily laden. The collision occurred about midnight, the night being dark but clear, and there was no wind. When the two tows were within about 1½ miles away, passing signals of two blasts were exchanged. At this time another steamer, which afterwards proved to be the Interocean, was showing lights indicating that she was coming up the river, a short distance to the westerly of the Kaliyuga and on a course parallel with the Kaliyuga and nearly abreast of the tow of the Appomattox. Having received but one signal from the two up-bound steamers, and being uncertain whether that was from the lone steamer or the towing propeller, the Kaliyuga repeated her signal of two blasts and checked down to about a speed of seven miles. This was again replied to by the Appomattox, and was recognized as coming from her. The two steamers approached on courses which enabled them to pass at a distance of about 150 feet apart, the Appomattox being a little to the westerly of the range line and the Kaliyuga a little to the easterly of that line. Just as the bow of the Kaliyuga was about abreast of the stern of the Appomattox, the Santiago, which up to that time had been well following her steamer, suddenly sheered to her starboard and toward the course of the Kaliyuga and her tow, the Fontana. The bow of the Santiago rubbed slightly against the starboard quarter of the Kaliyuga, and, passing nearly under her stern, followed the tow line, and came violently in collision with the Fontana, causing her to sink almost instantly. The owner of the Fontana libeled the Appomattox, the Santiago, and also the Interocean, alleging faults against each. The owners of the Appomattox and the Santiago, the St. Clair Steamship Company, answered separately for each vessel, and cited in the Kaliyuga and Fontana, and filed a cross-libel against them and the Interocean, charging that the fault was wholly that of the cross-libelees, or that they had contributed. District Judge Swan acquitted all but the Santiago, holding that barge solely responsible, and dismissed the libel and cross-libel as to each of the other vessels. From this decree the Boston Coal Dock & Wharf Company, owner of the barge Santiago and steamer Appomattox, has appealed from so much as holds its barge Santiago at fault, and in so far as the decree dismisses the libel as to the steamer Interocean and exonerates libelants' steamer Kaliyuga and its barge Fontana. The St. Clair Steamship Company, libelant and cross-libelee, also appealed from the decree holding that the cross-libelants' steamer Appomattox was not in fault, and that the steamer Interocean was without fault, etc.

John C. Shaw, for the St. Clair S. S. Co.

Harvey D. Goulder and Harrington Putnam, for the Boston Coal Dock & Wharf Co.

Robert T. Gray and F. H. Canfield, for the Interocean.

Herman Kelley, for the Fontana.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The two tows approached each other under passing signals, and in plain sight each of the other, and sailing on courses which would, if maintained, enable the Kaliyuga, and her tow, the Fontana, to pass at a safe distance on the starboard hand of the Appomattox and her tow, the Santiago. This course was kept until the steamers were almost abreast, the bow of the Kaliyuga being abreast of the stern of the Appomattox. Just at this moment the Santiago, which had up to this time followed very closely in the wake of the Appomattox, suddenly took a sheer to starboard, and came into collision, first with the Kaliyuga, and then with the Fontana. The Santiago was under obligation to follow her steamer. This she did not do, but suddenly changed her course and crossed the course of the passing down tow in such manner as to result in a collision. It is very clear on reason and authority that the Santiago is called upon to excuse this very extraordinary navigation, or stand condemned upon the presumptions arising from evidence that she did not follow her steamer, but deviated and crossed the course of the passing tow. Now, what is the excuse for this divergence from the wake of the Appomattox? The libel of the Fontana charges that this sheer was due to the suction produced by the Interocean passing so close on her port side as to draw "her stern toward and with her, throwing her bow in the opposite direction, to starboard, causing her to sheer in the direction of the Fontana." The answer of the Santiago admits that she sheered, and charges that her sheer was caused by the Interocean negligently coming so close alongside as to cause her to sheer to starboard "against a starboard helm." As between the Fontana and the Santiago there is, therefore, no issue as to the inition of the sheer. But if the descending tow was on its proper course, and in the exercise of due caution, this is not enough to acquit the Santiago, for as to the innocent Fontana her defense must go farther and show that she was in the exercise of due care when she came under the influence of the Interocean's suction, and that she exercised all reasonable diligence to break the sheer before colliding with the passing tow. The evidence clearly acquits the Fontana of all fault, and she would undoubtedly have passed the Santiago at a distance of not less than 150 feet on her starboard side if the latter had followed the wake of the Appomattox, as she was bound to do under her passing signals. Under such circumstances, the burden of proof continues with the Santiago until she shall show that her deviation from the wake of her steamer and her sheer across the bow of the Santiago was without fault upon her part. This is the well-settled rule in such cases, and has been over and over enforced by this court. The Olympia, 9 C. C. A. 393, 61 Fed. 120; The F. W. Wheeler, 24 C. C. A. 353, 361, 78 Fed. 824; The Ohio, 33 C. C. A. 667, 91 Fed. 547; The Centurion, 40 C. C. A. 634, 100 Fed. 663. There is no departure from this rule of evidence in the case of the Centurion. The question there was as to which of two passing vessels was at fault for the sheer of one by which she was brought into col-

lision with the other. No innocent third vessel was involved. No reference is made to any question of burden of proof, and the Marshall, the sheering steamer, was acquitted because the evidence affirmatively established that she had been guilty of no fault in her steering or equipment. The claim that her sheer was due to the negligence of the Centurion in passing too close was not made out, and both libel and cross-libel were dismissed because on all of the evidence neither had established fault against the other. But we think the defense of the Santiago is made out. Aside from any effect to be attached to the pleading, as between the Santiago and the Fontana, we think her sheer was initiated by the suction of the Interocean. Twice or three times the Appomattox refused the Interocean's request to pass up on her port hand. It is not essential that this should have been denied upon thoroughly good reasons, or that the master of the Appomattox discriminated arbitrarily in consenting a few moments before that another and larger steamer might pass up on the same side. The master of the Appomattox based his action, so far as his attention seems to have been directed to the matter, upon the ground that the channel was narrower and the current stiffer when he denied what he had before granted to another steamer. The first steamer was also faster than the Interocean, and this seems to have had some weight in influencing his judgment. In her anxiety to gain time, the Interocean pushed up until she was abreast of the Santiago, and, on the third denial of her request, checked. But this checking had so slight an effect as to result in no substantial change in her position, though it did have more or less influence in satisfying the master of the Appomattox that she would make no further immediate effort to pass him. For nearly two miles the Interocean continued alongside and nearly abreast of the Santiago, sometimes pushing a bit ahead, and then dropping a little behind. But for something over a mile preceding the collision she continued substantially abreast. The claim of the master of the Interocean that she was never abreast, but always astern, is contradicted by the very decided weight of the evidence. Until just prior to the Santiago's sheer, the weight of the evidence fixes the Interocean, after she had pushed up alongside, as never less than 100 feet away from the port side of the Santiago, and that this distance varied from that up to 150 feet. There is no evidence, expert or otherwise, tending to show that any danger from suction was to be reasonably anticipated so long as the passing vessels did not draw closer together than 100 feet. Upon this ground we think that no fault is to be found with the Appomattox for not stopping or checking so as to permit the Santiago to drop astern of the Interocean. The Santiago was the overtaken vessel, and it was the duty of the Interocean to keep off and allow a safe margin against the influence of suction from either vessel. But so long as the Interocean kept as much as 100 feet away, her proximity did not demand any special and unusual precautions to avoid the effect of suction. The duty of so steering as to keep properly in the wake of the Appomattox was the primary duty resting upon the Santiago. It was the duty of the Interocean if she came up abreast or passed or attempted to pass, to keep at a distance which would allow a safe margin against every reasonable anticipation of danger of suction or

other danger due to or increased by proximity to the Santiago. That the Santiago should keep under a starboard helm, in view of the current into which both vessels were heading at the time of the sheer, was dictated by the rules of safe navigation. But, according to all of the evidence from the deck of the Santiago, she was under a starboard helm when she started to sheer, and the helm put hard astarboard so soon as the sheer begun. The district judge, speaking of the sheer of the Santiago, said:

"The cause of her sheer can only be conjectured. My surmise is, and it is only a surmise, that she was suffered to get away a trifle to starboard, and the current caught her port bow and swung her across the course of the tow."

But this "surmise" is only made plausible, in the face of the positive evidence of the master and wheelsman of the Santiago, by rejecting the evidence tending to show that the sheer was started through the influence of the Interocean's suction. But the learned and experienced admiralty judge acquitted the Interocean with great reluctance, declaring that the evidence cast a "strong suspicion upon her," but saying, "The proofs are not demonstrative of the fault of the Interocean." Touching the probable influence of suction, he said "that the proofs are persuasive that, notwithstanding the disparity in tonnage between her and the Santiago, if she were as close as stated (by the crew of the Santiago),—some thirty feet,—that, moving as she was by her own power, the force of suction in that locality and in those conditions would very easily so far deflect the Santiago from her course as to throw the current on her port bow and account for her paying off as rapidly as she did, and shooting out in the path of the Kaliyuga and Fontana. She must have shot out then at a very high rate of speed, at least 150 feet, for there is no evidence of a change of course on the part of the Kaliyuga." But we think the learned judge erred in demanding that the evidence to convict the Interocean should amount to what he calls a "demonstration." Undoubtedly the Santiago is not to be acquitted merely by showing that she was caused to sheer by the influence of suction from the Interocean. In the case of the Ohio, where the facts were much like those of this case, the Ohio having been sunk by a collision with the Siberia, which claimed as a defense that her sheer had been caused by the too close approach of the Mather, we said:

"But the Siberia does not exonerate herself from liability to the Ohio by simply showing that she thus came within the influence of the 'suction' of a passing steamer. The Ohio has the right to call upon her to show that she was brought within this dangerous influence without fault, and that there was no fault in her management after this mysterious force began to exert itself upon her. Unless she can show that her deviation was due to a cause which she could not have reasonably avoided, how can it be said that the collision was inevitable,—that it was not occasioned in any degree by the want of such care and skill as the law requires and holds all men bound to exercise?"

But when the Santiago has shown that her sheer was caused by the influence of the Interocean's suction, and that she was not in fault for coming within the sphere of that influence or in respect to her management after the sheer commenced, she has shown that she was the blameless instrument of a collision for which the Inter

ocean is responsible. By an "inevitable accident" we are not to understand an accident which could not have been avoided by any degree of care or skill. "Inevitable accident," says Dr. Lushington, in the case of The Europa, 2 Eng. Law & Eq. 559, "must be considered as a relative term, and must be construed not absolutely but reasonably, with regard to the circumstances of each particular case. Viewed in that light, inevitable accident may be regarded as an occurrence which the party charged with the collision could not possibly prevent by the exercise of ordinary care, caution and maritime skill." The Morning Light, 2 Wall. 550, 17 L. Ed. 862.

To recur to the circumstances immediately preceding the collision. We have referred to the fact that there was no reasonable danger to the navigation of the Santiago in the mere fact that the Interocean was abreast of her, so long as she kept so far as 100 feet away. But the Interocean did not keep as far as 100 feet away from the Santiago. Just before the sheer began she for some cause drew closer in, and when the sheer started had drawn in as near as 40 or 50 feet, and probably even as close as 30 feet. This drawing in, on the weight of the evidence, occurred quite suddenly, and was immediately followed by the starboard sheer of the Santiago. The evidence coming from the Interocean is so sharply in conflict with that of the witnesses from the other vessels that it is useless to try to reconcile the divergent views. According to the story told by the Interocean people she never did come abreast of the Santiago, and never was nearer than 150 feet of the course of the latter. Indeed, on the evidence from her deck, the Interocean was so far over on the port side of the Santiago that her first mate in charge of her navigation at the time of the collision says that she was sagging in so close to the American bank about as the Kaliyuga and Appomattox came abreast that he ordered her wheelsman to port a trifle, and that she dropped "out from the dock a trifle, and I checked her right off with the starboard wheel." This witness places the Interocean, at the time he gave this order to port, as within about 40 feet of the American bank, which he sometimes calls the "dock." This is in itself an unlikely story, as it places him unreasonably close to the American shore, so close that he was fearing shallow water might sheer him. Now this porting was done at the very moment the Kaliyuga and the Appomattox were passing each other, and that was the very moment when the Santiago began her sheer. As the overwhelming weight of the evidence establishes that when this sheering began the Santiago was some 400 feet out from the American bank, and that the Interocean had been for a mile running abreast and within from 100 to 150 feet, it is fairly inferable that this porting was the cause for the Interocean drawing so much closer to the Santiago as to cause her to feel the influence of suction. Heading, as the Interocean was, into a stiff current, it was an easy thing to get the current slightly on her port bow and draw closer to the vessel on her starboard hand than was intended. That just at the moment when the sheer commenced the two vessels had drawn in to within 30 to 60 feet is established by the weight of evidence, and that this was quite near enough to effect the navigation of

the Santiago we have no doubt. The current catching the Santiago's port bow would make it hard to quickly break the sheer and send her off, much as the evidence shows she went. All that she could do to guard against the possibility of sheering, or that she might reasonably be required to do, was, in the situation, to be under a starboard helm. After the sheer began her helm should have been put hard astarboard. But the evidence is undisputed that she was under a starboard helm when the sheer started, and had properly followed in the wake of her steamer up to that moment. Her helm, on the evidence of her master and both wheelsmen, was starboarded as soon as the sheer started, and so far as we can see she was not in fault in getting within the influence of the Interocean's suction, or in her navigation, either just before or at the time or after the sheer. It follows that the Santiago, being in no fault, cannot be condemned, and the Fontana must, as between her and the Santiago, bear the loss due to an inevitable or blameless accident. The Interocean, for having violated her duty as an overtaking ship in approaching so close to the Santiago as to affect her by suction, must be held at fault.

We quite agree with the district court in the opinion that neither the Kaliyuga nor the Fontana are to be held liable. There is no evidence sustaining the charge against the Kaliyuga. The course she pursued, after exchange of passing signals, was in accordance with the understanding. The distance at which the two tows would have passed each other if the Santiago had followed in the wake of the Appomattox was a safe one. After the sheer commenced the Kaliyuga was checked, and her wheel put hard aport, and then hard astarboard, the purpose being to "twist" around the sheering Santiago. The weight of evidence is that it would have been wiser not to have checked, and better navigation to have kept full tension on the tow line, and thus a better control upon her tow. But the situation was one which required immediate action and allowed no time for reflection. It was a situation not brought about by the fault of either the Kaliyuga or her tow, and, if her master failed in the exigency (for the collision must have occurred within one minute from the beginning of the sheer), the Kaliyuga ought not to be condemned for an error of judgment in extremis. The Fontana closely followed her steamer, and, although she had no outlook at the time of the disaster, it is clearly shown that her master saw everything which a watchman could have seen, and adopted every precaution which reasonable navigation in the exigency of the case demanded. The Appomattox must also be acquitted. That her lookout had gone below just before the sheer of the Santiago is shown. This casts upon the Appomattox the burden of showing that the presence of the lookout would not have prevented the collision. The George W. Roby, 49 C. C. A. 481, 111 Fed. 601. It is clearly shown that her master saw everything and heard every signal which a lookout could have seen or heard, except that he did not see that the Interocean had come up abreast of the Santiago, and had been keeping about abreast for about 10 or 15 minutes before the collision. This was a fact which might have been sooner observed and re-

ported if the lookout had not gone below at about the time the Interocean checked. The last report by the lookout to the master was that the Interocean was dropping back a little. This was immediately after the third request of the Interocean for permission to pass up on the port side of the Santiago had been denied. The master acted upon the belief generated by the checking of the Interocean, and this report of his lookout that she was dropping back, and, for perhaps a mile before the sheer began, had not looked back to see her position, his attention being given to the approaching down tow. But if he had looked back, or if the watchman had been in his place and reported the situation, it was one which presented no reasonable danger from suction so long as at least 100 feet was maintained between the two vessels. Now, on the overwhelming weight of evidence, this distance or greater was maintained until just before the sheer began. This is the moment when the master of the Appomattox observed that the Interocean had drawn in close to his barge, and realized that there was danger from their proximity. If there was no reasonable ground to apprehend danger from the influence of suction so long as the Interocean was as much as 100 feet away from the Santiago, we are unable to see that her lookout's absence from his post in any way contributed to the disaster, or that his presence would have prevented it, for it would have been no fault if the master of the Appomattox, with knowledge of the facts, had kept his speed and course, in reliance that the Interocean as the overtaking vessel would come no nearer his tow, and thus avoid any danger incident to too close proximity.

There has been some claim that the steering qualities of the Santiago were bad, and that she was a craft very subject to sheers. This contention has been in part rested upon evidence offered and rejected tending to show that the boat had a bad reputation for sheering. No error, however, has been assigned for the exclusion of this class of testimony. The principal evidence admitted bearing upon this matter came from two witnesses who had for a short time sailed on the Santiago. But the district judge saw and heard these witnesses testify, and he took care to say in his opinion—made part of the record under the rule of this court—that he did not "believe their testimony," and that, on the great preponderance of the evidence, "she was a good steering vessel." Under such circumstances we should be slow to come to a different conclusion in respect of a fact where the credibility of the libelant's most material witnesses had been so directly challenged by the trial judge. City of Cleveland v. Chisholm, 33 C. C. A. 157, 90 Fed. 431. In view of the fact that this sheer is plainly and satisfactorily shown to have been started by the influence of suction, there is no reason to suspect either bad navigation or bad steering qualities as either starting or aggravating it. The conditions were exceedingly favorable for a dangerous sheer if one were but started, for with the current even slightly on the port bow of a vessel not having her own power it would be very easy to sheer far enough to the starboard side to collide with a vessel on a course only about 150 feet away. The same causes would make it very hard to break a sheer in time to avoid a collision with

vessels passing so near as was the case here. We held the Siberia had contributed to the collision with the Ohio upon a very different state of facts, involving a much wider sheer, and under conditions altogether favorable for breaking it. In addition, there was a conflict of ominous character as to the steerage of the Siberia. The Ohio, 33 C. C. A. 667, 91 Fed. 547.

A question has been made as to the damages. The loss of the Fontana was total, and her full value, with interest, together with her pending freight, was allowed. It is now insisted that her lost earnings under her charter should have been allowed also. Her charter was an oral contract to carry ore during the season of navigation at $1.10 per ton, payment to be made at completion of each voyage for the ore carried. The disallowance of future profits under her charter was right. Further installments could only be earned as each voyage was completed. As a compensation the owners were allowed the full value of their vessel, and that value, with its interest, or the vessel procured with that value, stands in the place of the lost ship and its future earnings. The precise question was fully decided by this court on identical facts in the case of The George W. Roby, 49 C. C. A. 481, 495, 111 Fed. 601.

The decree of the district court will be affirmed as to the Appomattox, Kaliyuga, and the Fontana, and reversed as to the Santiago and Interocean. The cause will be remanded, with direction to enter a decree against the Interocean and to dismiss the libel as to the Santiago. The costs of these appeals will be paid as follows: One-third by the Boston Coal Dock & Wharf Company, and the remainder by Henry W. Watson, claimant of the steamer Interocean. The costs below will be taxed at the discretion of the district court.