## THE J. G. GILCHRIST.

### THE SIMLA.

(District Court, W. D. New York, July 21, 1909. On Settlement of Decree, October 4, 1909.)

1. COLLISION (§ 51*)—PRECAUTIONS FOR PREVENTING COLLISIONS—OVERTAKING VESSELS.

The duty rests upon an overtaking vessel to keep out of the way of the vessel ahead, and she is only entitled to pass at a time and place where it is suitable and safe, taking all factors into account, including the danger of suction.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 57–61; Dec. Dig. § 51.*

Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. COLLISION (§ 99*)—PRECAUTIONS FOR PREVENTING COLLISIONS—OFFICERS AND LOOKOUT.

It was negligent for the master of a steamer to navigate her down the St. Clair river without a lookout, and with no officer in charge of her navigation, except a mate, who was also acting as wheelsman.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 211; Dec. Dig. § 99.*]

3. COLLISION (§ 105*)—OVERTAKING VESSELS—BURDEN OF PROOF AS TO FAULT.

Where, as an overtaking vessel was passing a much smaller vessel in St. Clair river, the latter suddenly sheered from her course, resulting in her collision with the overtaking vessel, and also with a third vessel passing on an opposite course, the overtaking vessel has the burden of proving that she did not cause such sheer, taking into account the speed and distance at which she passed and the effect of her suction.

[Ed. Note.—For other cases. see Collision, Dec. Dig. § 105.*]

4. COLLISION (§ 91*)—STEAM VESSELS MEETING—EVIDENCE AS TO FAULT.

As the steamer Simla, 1,500 gross tonnage, was passing down the St. Clair river, where the channel was 1,600 feet wide, she was overtaken by the Gilchrist, 3,900 tons, which, after a proper exchange of signals, undertook to pass to the starboard of the Simla, and at a distance of not less than 100 feet, and a speed not excessive. When opposite, the vessels came together, and after a slight collision the Simla sheered sharply to port and came into collision with the steamer Smith, which was passing up at a distance of 600 or 800 feet. The Gilchrist was properly officered and manned, with an attentive lookout; but the Simla had no lookout, and the second mate at the wheel was the only person on her deck. *Held,* on the evidence, that the approach of the two vessels was not due to the suction of the Gilchrist, nor to her holding a converging course, but to the fact that the Simla was not properly manned and her wheelsman failed to hold her course, as he was bound to do under the rules, but sheered toward the Gilchrist until the Simla came within the influence of her suction, which caused the sheer to port and the second collision, and rendered the Simla solely in fault therefor.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. § 91.*]

5. COLLISION (§ 125*)—ACTION FOR DAMAGES—EVIDENCE.

While, as a general rule, the testimony of the officers and crew as to what took place on their own vessel is entitled to more weight than that of persons on other vessels, yet, where the other vessel was not more than 100 feet distant, with nothing to obstruct the view of those on board, their testimony as to the movements of the passing vessel cannot be wholly ignored.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 269, 270; Dec. Dig. § 125.*]

6. COLLISION (§ 130*)—DAMAGES—DEMURRAGE—INTEREST.

In collision causes, where demurrage is awarded as a part of the damages, interest should be allowed thereon from the time of collision, unless there are special reasons for its disallowance, in the discretion of the court.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 284; Dec. Dig. § 130.*]

In Admiralty. Suit for collision by the United States Transportation Company, as owner of the steamer L. C. Smith, against the steamer Simla and the steamer J. G. Gilchrist. Decree for libelant against the Simla.

Goulder, Holding & Masten, for libelant.

Hoyt, Dustin, Kelley, McKeehan & Andrews (Hermon A. Kelley and G. W. Cottrell, of counsel), for the J. G. Gilchrist.

Clinton, Clinton & Striker, for the Simla.

HAZEL, District Judge. On November 26, 1905, at about 9:15 o'clock in the forenoon, there was a collision in St. Clair river, off the dock at Woodtick Island, situated below Marine City, Mich., between the steamer Simla, downbound to the port of Kingston, Canada, and the steamer L. C. Smith, upbound to the port of Duluth, Minn., which collision resulted in damage to the latter vessel. Just before the collision, the Simla collided with another steamer, the J. G. Gilchrist, also downbound to Lake Erie, which was overtaking her on her starboard side; passing signals of one blast having been seasonably exchanged between them. The Simla was a vessel of 1,490 gross tonnage, 226 feet keel, 35 feet beam, and depth of 14 feet. The steamer L. C. Smith had a gross tonnage of 4,702, length of keel 414 feet, over all 434 feet, beam 50 feet. The Gilchrist was a vessel of 3,871 gross tonnage, length of keel 356 feet, beam 50 feet, and draft 18 feet 3 inches forward and aft. The Gilchrist was laden with iron ore, and the Simla with 50,000 bushels of wheat. It was a clear day, with a little wind blowing from the west. The navigable channel abreast of Woodtick Island is about 1,600 feet wide.

The libel charges the Simla with fault for diverging from her course after port to port passing signals had been exchanged with the Smith, and it charges the Gilchrist with fault in overtaking the Simla at such rate of speed and propinquity as to interfere with her safe and proper navigation, and thereupon becoming responsible for her sheer to port and into the Smith. The Gilchrist charges that the Simla, which was proceeding at a slow rate of speed, crowded upon her course after agreeing upon a starboard passing; that the Gilchrist was proceeding at a safe distance abreast of the Simla, when suddenly the Simla dropped over toward her, apparently under a port wheel; that the engines of the Gilchrist were immediately stopped, but the starboard bow of the Simla struck the Gilchrist's port quarter. It is claimed by the Simla that the Gilchrist negligently crowded on her course; that when her bow was about abreast of the boiler house of the Gilchrist, which was proceeding at a rate of about 10½ miles per hour through the water and about 2 miles per hour faster than the Simla, the latter vessel sheered from her course and slightly touched the Gilchrist; and that then the suction of the Gilchrist came under the stern of the Simla, and, notwithstanding her reversal at full speed of the engines and porting her helm, she violently sheered to port, almost at right angles, crossing the course of the steamer Smith, and striking her forward of her boiler room. At the close of the case neither the Simla nor the Gilchrist attributed any fault to the Smith; both practically conceding that damage resulted to her through the negligent navigation of either the Simla or the Gilchrist.

The testimony is conflicting as to whether the initial sheer of the Simla was caused by faulty steering to starboard, or whether the Gil-

christ passed so close as to influence by her suction the departure of the Simla from her course. The pilot rules regulating navigation in St. Clair river in force at the time of the collision required (1) overtaking vessels to keep out of the way of the overtaken vessel; (2) the overtaken vessel to keep her course and speed, without crossing the bow or crowding the passing steamer. Rules 20–22 of Navigation of Great Lakes; Pilot Rule 6. Lawrence, second mate of the Simla, who was at the wheel at the time of the occurrence, testified that, immediately upon noticing the danger which menaced from the proximity of the Gilchrist, she then being about 40 feet distant on the right side, he ported a little, a point or so, to allow the Gilchrist more space for passing, but the Simla did not respond to such movement, owing to the suction of the Gilchrist, which drew her stern over to starboard; that he checked down her speed when the Gilchrist was about two-thirds ahead of the Simla. At this time the master of the Simla, who had been below, quickly came on deck, and, entering the pilot house, assumed command of the vessel, and backed her engines; but the Simla nevertheless sheered violently to port and into the Smith. The evidence shows that at the time of the initial sheer or drawing toward the Gilchrist, and prior thereto for upwards of a half hour, the Simla was without a lookout, and her master was not in charge of her navigation. In fact, there was no one on deck attentive to duty, except the second mate, who alone was at the wheel. It was an omission of duty on the part of the master to permit the Simla to proceed down St. Clair river without a competent lookout, and without intrusting her navigation to a mate or competent seaman, aside from the wheelsman, while engaged in other duties below deck.

It is a well-established rule of admiralty law that there must be a competent lookout on board a vessel, whose duty it is to carefully observe the movements and proximity of other vessels navigating in different directions or on other courses, and which are factors, or likely to become such, in her navigation or movements, and to make report thereof to the person in charge of her navigation. Spencer on Marine Collisions, §§ 172–173; The Coleman, Fed. Cas. No. 2,981; The Arthur Gordon and The Independence, Lush. 270. This salutary rule having been ignored by Capt. Malone of the Simla, the point is urged in behalf of the Gilchrist that in view of the circumstances a presumption of fault arises against the Simla, even though she was the overtaken vessel, and that therefore the burden is cast upon her to satisfactorily explain her initial deviation from her course. It is conceded that, as between the Smith and the Simla, the burden was upon the latter vessel to explain her sudden divergence from her course and to excuse her apparent misconduct. The Atlantis, 119 Fed. 568, 56 C. C. A. 134. But I think, as between the Gilchrist and the Simla, the overtaking and overtaken vessels, the rule is different. The overtaking vessel is obliged to keep out of the way of the ahead vessel, and the burden rests upon her to establish that the ahead vessel was not influenced by her suction. She could only pass at a time and place when it was suitable, proper, and safe to do so, having strict regard for the dangers from the force of suction. The master of the Gilchrist

is presumed to have been familiar with the subtleties and dangers from suction or the displacement of the water by the Gilchrist, a larger and faster vessel than the Simla, and in the navigation of his vessel on a parallel course and sailing in the same direction he was bound to take such forces into consideration. The Fontana, 119 Fed. 856, 56 C. C. A. 365; The Ohio, 91 Fed. 551, 33 C. C. A. 667. Concededly the Gilchrist had the right at this point in the river to pass the Simla upon complying with the pilot rules of the Great Lakes, which required her to first acquaint the ahead vessel with her desire to pass by blowing one blast of the whistle to pass on her right or starboard side, or two blasts of the whistle to pass on her left or port side, and then only upon receiving an answering assent.

Although the Gilchrist attributes fault to the Simla for not having a competent lookout and navigator on duty at the time of the initial sheer, yet the contention is that the main fault arose from the incompetent and negligent conduct of the wheelsman, who failed to hold the vessel in her course by improperly porting her helm. Considering the evidence in its entirety, I am constrained to agree in this contention. According to the witness Lawrence, when the bow of the Gilchrist came abreast of the Simla's stern, she was about 100 feet distant on the starboard side. In this estimate he seems to be supported by the observations of the witnesses on board the steamer Smith. The master of the Gilchrist, however, her two mates, two wheelsmen, and her steward testify that the distance apart between the steamers when the Gilchrist lapped the stern of the Simla was 200 to 250 feet, and that such distance was maintained until they perceived the Simla dropping over towards the course of the Gilchrist. Assuming the distance to have been but 100 feet, it is not claimed that there was anything unusual or unsafe in the situation, or that sheering from suction by the ahead steamer should have been anticipated. The relative positions of the vessels when they began lapping each other was not dangerous or out of the ordinary.

It is contended in argument by counsel for the Simla that the overtaken and overtaking vessels were navigating on slightly converging courses from the time passing signals were blown at Recors Point, and that the distance between them was so materially reduced in passing that the Simla came under the influence of the suction of the Gilchrist. Certainly, if such was the fact, the Gilchrist should be condemned for not keeping a parallel course and getting in the way of the ahead steamer; but this contention, I think, is inadequately supported by the facts, although I have carefully considered the reasons assigned for its advocacy. In my mind, a preponderance of the testimony establishes that the wheelsman of the Simla erred in maneuvering her helm to port, causing the vessel to swing to starboard and toward the Gilchrist. It was the duty of the Simla to hold her course, except to avoid danger, and to swerve or depart therefrom was a violation of rule 20 and pilot rule 6, and accordingly the Simla is called upon to prove that her deviation did not precipitate the disaster or contribute thereto.

The theory of sailing on converging courses is predicated upon the testimony that to the witnesses on the Gilchrist the Simla appeared to

be dropping over toward her on an angle of a half point or a point, while to the wheelsman of the Simla the Gilchrist seemed to be coming over to port and toward the Simla. To the witnesses on the Smith, the Simla appeared to drop over toward the Gilchrist, as distinguished from over to starboard. The witnesses on the Smith, however, were too far away to accurately state the movements of the vessel, and I do not think their testimony on this point is entitled to great weight. The inference of proceeding on converging courses would probably legitimately follow, if it were not satisfactorily shown that Lawrence ported the Simla's helm, not deliberately, but evidently through mistake and want of proper precaution. He manipulated the wheel in such a way as to cause her to edge over toward the Gilchrist. I am not unmindful of the rule that ordinarily the testimony of the officers and crew to acts committed or omitted on their vessel is entitled to more weight than the testimony of witnesses on other vessels, whose views are chiefly derived from what they believed they observed (The Alex. Folsom, 52 Fed. 403, 3 C. C. A. 165); but in the present case the witnesses for the Gilchrist were distant from the Simla not more than 100 feet, the pilot house and wheelsman of the Simla were in their direct line of vision, and there were no disturbing or interfering atmospheric conditions. Under these circumstances, the testimony of witnesses on a passing vessel should not be entirely ignored or set aside.

Upon the subject of whether the Simla's helm was ported or starboarded there was much controversy. The testimony of Lawrence left the impression in my mind that he did not maintain positive or accurate control of the helm. His responses to questions as to what he did at the wheel, at the critical time when deliberate action, based on sound judgment, was demanded, is not convincing. His testimony as to whether he rolled the wheel over to port or to starboard to give the Gilchrist more space in passing was somewhat confused, and my impression is that just before the sheering he labored under such excitement as would probably account for his faulty steering. This view finds support in the fact that he alone was in charge of the wheel and of the navigation of the vessel. There was no lookout or responsible mind to guide him at a time when direction and keen observation were required, and in the circumstances probably his error in failing to hold the vessel's course is not without palliation. The Simla, however, must be held at fault for not being properly manned and officered, as a result of which the wheelsman inefficiently and improperly steered the vessel, failing to hold her course, and bringing her under the influence of the suction of the passing steamer. The proofs show that the Gilchrist was properly manned and officered, with lookout attentive to his duties; that she undertook to pass the Simla at sufficient distance alongside to keep her suction from interfering with the Simla, if properly navigated. She was well over near the American shore (about 400 feet), as far over as was proper and safe for her navigation. It is not seriously claimed that her speed was excessive. Her wheelsman carefully steered on trees ahead, which brought him still closer to the American side of the river. The Simla, also, was proceeding in the channel, not far distant from the American shore, with an abun-

dance of deep water between her and the course of the Smith, which was variously estimated at from 600 to 800 feet. On the instant that it was noticed that the Simla was edging over, the master of the Gilchrist promptly checked, and then quickly stopped, his engines. There was nothing else he could do with safety. Indeed, to have ported at such close quarters, or to have reversed her, would have caused her stern to swerve to port, and in all probability into the Simla, while, on the other hand, the effect of stopping her engines tended to reduce or allay the force of her suction. In my judgment, the Gilchrist was properly navigated, and there is no evidence to attribute to her any blame for the collision between the Simla and the Smith.

This conclusion makes it unnecessary to discuss any alleged errors in extremis by the Simla, subsequent to her initial sheering, and explanatory of the collision with the Smith.

The libelant may have a decree against the Simla, holding her solely at fault, with costs, and dismissing the libel against the Gilchrist.

### On Settlement of Decree.

On settlement of final decree the question arose whether interest on demurrage should properly be allowed from the date of loss, as specified in the stipulation filed herein, or from the entry of decree. Heretofore this court apparently held in The Sitka, 156 Fed. 427, on the authority of The Eloina, 4 Fed. 573, that interest on demurrage was only recoverable from the date of decree, and not from date of loss or injury. But this broad holding is not sustained by the weight of prior decisions. Collision cases are now called to my attention by which it is clearly shown that, not only is demurrage a proper element of damage, but that interest should be allowed from the time of collision, unless in the discretion of the court there are special reasons for its disallowance. The reason for the rule is that the party damaged is entitled to a complete return for the loss sustained by reason of the tort, and the interest is regarded as a part of the indemnification or damage award. The liability for interest usually relates to the date of injury, subject to the exercise of a sound judicial discretion. The Mahanoy, 127 Fed. 773. In Milburn v. Thirty-Five Thousand Boxes of Oranges and Lemons, 57 Fed. 236, 6 C. C. A. 317, the Circuit Court of Appeals for this circuit, in a cause of admiralty for detention and discharge, considered the refusal of the district court to allow interest, and Judge Lacombe, speaking for the court, in effect said that there was no reason why demurrage should be subject to any other or any different rule than that which obtained in other cases. This would seem to settle any uncertainty in this district as to the allowance of interest on demurrage from the date of injury which may have been created by the decision in The Eloina, supra.

So decreed.