## Case No. 6,399.

### The HERBERT MANTON and The J. H. GAUTIER.

• [14 Blatchf. 37.] [1]

Circuit Court, S. D. New York. Nov. 11, 1876.[2]

COLLISION — STEAM-TUG LASHED TO CANAL-BOAT AND SAILING VESSEL—RULE UNDER SUCH CIRCUMSTANCES.

1. A steam-tug and a canal-boat lashed to her side are to be regarded, in respect to the duties of navigation, as one vessel, and that a steam vessel.

2. A tug with a canal-boat so lashed to her must keep the canal-boat out of the way of a sailing vessel, when there is danger of collision between them, and the sailing vessel must keep her course.

3. The sailing vessel has a right to rely on the observance of the rules of navigation by the tug, and cannot herself safely depart from them.

4. Judgment as to the motion, or direction of motion, of one vessel, made from another, possesses the utmost uncertainty; for, the tendency is nearly irresistible for the observer to transfer to the other vessel the motion of that on which he stands, and thus to regard the compounded motion of the two as belonging to that one which he is observing.

[Appeal from the district court of the United States for the Southern district of New York.

[These were libels against the steam-tug J. H. Gautier and the schooner Herbert Manton for damages sustained by collision resulting in the total loss of the canal-boat Gettysburg and her cargo. The district court held the tug wholly in fault, the libel against the schooner being dismissed in each case, with costs. Case No. 7,319.]

Robert D. Benedict, for libellants.
Edward H. Owen, for the schooner.
Welcome R. Beebe, for the tug.

JOHNSON, Circuit Judge. On the 28th of November, 1871, between nine and ten o'clock in the forenoon, a collision occurred between the canal-boat Gettysburg, laden with coal, and the schooner Herbert Manton, within about fifty feet from the steamboat wharf at Astoria, Long Island, and a little above the end of Blackwell's Island, whereby the canal-boat and her cargo were lost. The weather was fair, the wind about northwest by north, and the tide the last of the flood, and running about four miles an hour. The canal-boat was lashed to the port side of the steam-tug J. H. Gautier, her bow extending some fifty feet beyond the bow of the tug, and in that position the tug was towing her from Twenty-Third street, New York, to the steamboat dock at Astoria. After leaving Twenty-Third street, the tug proceeded along up with her tow through the channel between Manhattan Island and Blackwell's Island, until she had reached a point above Blackwell's Island, when she ported her helm and swung around with her head towards Astoria and towards the dock to which she was bound, and where the boat's cargo was to be discharged. The river, at the place where she rounded to, is about one thousand feet wide. The tug, with her tow, was going at the rate of about five miles an hour. The pilot of the tug saw the Herbert Manton just as she came around Hallett's Point and had got straightened down. The schooner was then about 600 or 700 feet distant from the tug. He then blew his whistle, but kept on his course, his helm being all the time to port, and his vessel on the swing to starboard until the collision. He did nothing towards keeping out of the way of the schooner. The schooner was bound on a voyage to New York, and, after going through Hell Gate, and having rounded Hallett's Point, was proceeding on with a view to enter the channel between Blackwell's Island and Long Island, just as the tug was swinging around, as before stated, with the port side of the canal-boat towards the schooner. The schooner kept on her course without any change, except as hereinafter stated; and the tug, in attempting to reach her dock, brought the canal-boat right under the schooner's bows, and the schooner struck, stem on, the port side of the canal-boat. The course of the schooner, after rounding Hallett's Point, ranged along Long Island shore, which carried her near the dock at Astoria, where the collision occurred. The schooner changed her course aforesaid after she rounded Hallett's Point, only at the moment of collision and in the jaws of peril, and when a collision was inevitable. She had a competent and proper lookout, and was in all respects properly navigated. At the time of the collision there were a number of vessels in the vicinity, close to the Herbert Manton, and going the same way with her, and the tug-boat J. F. Whitney, with a tow, was approaching from New York, so that the schooner could not have safely luffed to avoid the collision.

It is quite clear, on settled principles, that the canal-boat and the tug to which it was fastened are to be regarded, in respect to the duties of navigation, as one vessel, and that a steam vessel; and that the rules which are to be by law applied to vessels under steam, with a view of securing safety in navigation, are applicable to the tug and her now lashed to her so as to be governed and controlled by her motions. Sturgis v. Boyer, 24 How. [65 U. S.] 110; The Keystone State, 22 How. [63 U. S.] 461. Considering the tug and her tow as a steam vessel, the twentieth of the navigation rules (Rev. St. U. S. § 4233), requires that when there is risk of collision between a sailing vessel and a steam vessel, the latter shall keep out of the way. The correlative duty is imposed on the sailing vessel, by rule 23, to keep her course, subject

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Affirming Case No. 7,319.]

to the qualification stated in rule 24, that, in construing and obeying the rule, due regard must be had to all dangers of navigation, and to any special circumstances which may exist in any particular case, rendering a departure from it necessary in order to avoid immediate danger.

The libels allege, and the answers of the schooner admit, that the tug was in fault in turning in to the dock ahead of the schooner, instead of allowing her to pass close between them and the dock, as she otherwise would have done. This ends that question, as between the schooner and the libellants.

In respect to the tug, the evidence is entirely clear, that she held on her course towards the dock, apparently determined to force the schooner to assume her duty of keeping out of the way, while both in fact and in law she might have avoided the collision by stopping and backing, or by yielding the way to the schooner and passing under her stern instead of across her bows. But I do not find that the schooner could have avoided the collision by any act on her part, after it became apparent that the tug was intending not to yield the way. The schooner had a right to rely on the observance of the rules of navigation by the tug; and she could not herself safely depart from them for fear that the tug would fail to observe them, lest she should thereby precipitate the catastrophe which she was striving to avoid. When the law casts upon a steam vessel the general duty and responsibility of avoiding collision with a passing vessel, and a collision nevertheless occurs, the presumption is that the fault is that of the steam vessel. This presumption can only be overcome by proof of fault on the part of the sailing vessel, producing or contributing to the collision. Leavitt v. Jewett [Case No. 8,172]. Now, the only ground of this sort, of any gravity—for I deem the lookout to have been properly kept—consists in the allegation that the schooner, after rounding Hallett's Point, altered her course, in violation of the rule before cited. But, as matter of fact, I find this allegation to be unfounded, except at the moment before the collision actually occurred, and when it had become inevitable. Judgment as to the motion, or direction of the motion, of one vessel, made from another, possesses the utmost uncertainty; for, the tendency is nearly irresistible for the observer to transfer to the other vessel the motion of that on which he stands, and thus to regard the compounded motion of the two as belonging to that one which he is observing. I, therefore, give greater weight to the testimony of Captain Crowell of the Herbert Manton, who had the wheel, and says that he did not change the course of the vessel till just at the moment of collision, from the time he got around Hallett's Point, except to steady her to run down channel. By this I understand what is elsewhere referred to in connection with her rounding the Point, as

straightening her on her course. Kelly, the mate, confirms the captain, saying that he stood by the captain, by the wheel, and saw no change of course after they rounded the Point. The lookout, E. B. Kelly, says: "I could not see any change in the course of our vessel. After I reported the tug, and before the collision, I thought she kept right along." On cross-examination, he testifies: "After we rounded Hallett's Point we kept a straight course." These witnesses were so situated, at the time of the occurrence, that they had the full means of knowing what was the fact. In my judgment, their testimony outweighs that of others who were not so favorably circumstanced for seeing what took place. In my opinion, the only change of course that took place was that spoken of by the witness Longstreet, who says that the man at the wheel of the Herbert Manton "hove his wheel, first, two or three spokes to the starboard and then to port; a second after that she struck the canal-boat."

The decree of the district court [Case No. 7,319], ought to be affirmed, with costs.