WEST VIRGINIA CENTRAL & P. RY. CO. *v.* THE ISLE OF PINES and an-other.

WILLIAMS and others *v.* THE ISLE OF PINES.

*(District Court, S. D. New York.   June 30, 1885.)*

COLLISION—RIVER NAVIGATION—TACKING—NOT GIVING WAY.

   The schooner I. of P., in beating up the East river off Gouverneur street, on her long tack passed close ahead of the tug McM. with a tow, and then, after running 600 or 800 feet, tacked and ran straight across the river, designing to go ahead of the tug again, but collided in doing so.   The tug had backed strong, to let the schooner go ahead at first, and had then hooked up her engines to go ahead strong; in order to get ahead of the schooner.   *Held,* that both were in fault; the tug, for attempting to get ahead in the narrow space available; the schooner, for not heeding the tug's evident intention, and not either port-ing or starboarding, as she might easily have done, and thus have avoided the collision

In Admiralty.
*Carpenter & Mosher,* for the West Virginia, etc., Ry. Co.
*Hyland & Zabriskie,* for the Jas. McMahon.
*Butler, Stillman & Hubbard,* for the Isle of Pines.

BROWN, J.   Off Gouverneur street, where this collision took place, there were about 1,300 feet available breadth of the river from pier to pier.   All the witnesses agree that the tug McMahon, with a tow of two boats lashed on each side, was making her way directly up the river, at about the rate of four miles an hour, on a course E. ½ N.   The schooner Isle of Pines, having the wind about E. S. E., and sailing close-hauled on her starboard tack, about six points off the wind, was heading about N. E., and was going at the rate of about six miles an hour.   She passed the bows of the tug and tow from starboard to port, clearing them by some 15 feet only, and, as her witnesses state, ran within about 200 or 250 feet of the New York shore.   The dif-ference of their courses was but about three and a half points, and carried the schooner, before she tacked, as was estimated, some 500 or 600 feet ahead of the tug.   She then tacked; and upon her port tack, headed nearly directly across the river, perhaps half a point to the southward, and in crossing the bows of the tow came in con-tact with the starboard boat and caused her to sink.

Assuming, as all state, that the tug was in the middle of the river, and the schooner, including her jib-boom, being 160 feet long, there was not over 450 feet available space on the port side of the tow. Had the schooner run out her full tack, on a north-east course, so as to make this distance abeam, she would have had to run about 800 feet after first passing the tug and tow. This is considerably in excess of the estimate of her own witnesses. The inference, therefore, is that the libelant's witnesses are probably correct in saying that she did not run out her full tack. The mate says that after her tack was completed, and she bore away upon her proper course on the port tack, she was about 500 or 600 feet from the tug. As she was going at the rate of five or six miles an hour, that distance would be accomplished in about one minute, or a little over, allowing for her slowing in coming about, and the tug, during the same time, would move through the water from 300 to 400 feet. This testimony fixes the position of the boats with more than usual accuracy. If it is to be relied on, it shows that the schooner, while she did not fully run out her tack as near to the shore as she possibly might have gone, did not come much short of it; but having the full space available to her, she was, in my judgment, bound to take notice of the incumbered condition of the tug, and of the fact that she was not, at the time the schooner tacked, backing, but was moving ahead all she could, and, therefore, evidently designing to go ahead of the schooner. Had this been observed, as it ought to have been observed, at the time the schooner tacked, there would have been no difficulty in the schooner's following this obvious indication, and, under a continued port wheel, have swung round so as to go astern of the tug and tow. The space that was available to the schooner towards the New York shore was so small that it was dangerous to pass ahead of and so near to the tug upon her previous tack, and then go about and undertake to pass ahead of her again. The tug had backed strong to allow the schooner to pass her at her first crossing, and then had hooked up and gone ahead strong in order to pass ahead of the schooner before her return on her port tack. The maneuvers of each bound each to a careful observance of the other, and when the tug's purpose was evident, as it should have been evident, to any proper lookout on the schooner, the schooner should have governed herself accordingly, and passed astern, or else have luffed and made another short tack; either of which was, in my judgment, entirely available to her.

2. I think the tug, however, was also clearly in fault for hooking up and going ahead after the schooner had first passed to port, instead of keeping her course until the schooner should return upon her port tack. The more rapid speed of the schooner, and the short space available to her, rendered her speedy return ahead of the tug obvious to any competent pilot. It was the primary duty of the tug and tow to keep out of the way of the schooner, and let her have her proper course. There was no danger to the tug and tow either in

continuing to back, or in going under a slow bell, as they had begun, until the schooner again crossed on her short tack. Instead of doing this, the tug attempted, with, I think, obvious imprudence, to run ahead of the schooner, and she thus brought about the collision; but as the tug's purpose was sufficiently obvious to a proper lookout on the schooner, and the danger of collision being apparent, and as the schooner might, by either porting or starboarding, have avoided the collision, the damages must be divided, both being in fault.