## THE CITY OF ALEXANDRIA.

### DEEP-SEA HYDRAULIC DREDGING CO. *v.* THE CITY OF ALEXANDRIA.

(*District Court, S. D. New York.* November 25, 1889.)

1. COLLISION—DAMAGES—COST OF VESSEL.
   In assessing damages on total loss by collision, though the cost of construction is competent evidence where no market value is ascertainable, the whole cost should not be given as damage where the vessel could be duplicated for a less sum, and the cost testified to includes various changes and improvements.

2. SAME—LOSS OF PROFITS—PERSONAL CONTRACT.
   Upon a total loss, though compensation is allowed for the profits which would have been realized upon an existing charter of the vessel, because the charter is itself thereby lost, this rule does not apply to profits on a personal contract, in which any other fit vessel might be used.

3. SAME.
   The libelant used three dredges in carrying out a contract with the government for excavating "320,000. more or less, cubic yards of material" in Gedney's channel; and, after one dredge was sunk, continued the work for 60 days thereafter, when they were stopped by the government upon the excavation of 304,000 cubic yards.

*Held*, that the libelant was entitled to recover only the value of the dredge from the time of the loss, with interest; that it could not recover for any loss of profits, (1) because there was no such charter of the dredge lost as prevented the substitution of another dredge; (2) because the contract was substantially fulfilled, within the discretion of the government, and the libelant had therefore no certain right to excavate more than it did.

4. SAME—COST OF RAISING WRECKED VESSEL—EVIDENCE.

The libelant employed wreckers to raise its vessel, to be paid a proportion of her value if raised, upon a written contract executed the day before work was commenced. The wreckers testified to a parol modification that they were to be paid the value of their services up to $7,500, if the same could be recovered from the defendant vessel; but no reference was made to the existing contract, and the libelant did not confirm the same. *Held*, that evidence of the change of contract was insufficient, and that the written contract should prevail.

Exceptions to Report on Damages.

*Geo. A. Black*, for libelant.

*R. D. Benedict*, for respondent.

BROWN, J. Both vessels were found in fault for the collision in the above case, (31 Fed. Rep. 427,) and both parties have filed exceptions to the report of the commissioner on damages.

1. *Value of the Queen.* The Queen, having been sunk, proved to be a total loss, as her value when raised was less than the cost of raising. She was a dredge of peculiar construction; and, there being no such market as to establish a market price for such a structure, the valuation reported was based upon the cost of construction. Her hull was formerly a scow, bought in 1885 for $15,180, and she was completed by the addition of much machinery, wood-work, and appliances of many kinds for working certain patents, through various experiments, changes and improvements, down to March, 1886, when she commenced dredging in the vicinity of Gedney's channel, where she was sunk on the 6th of the following September. While evidence of cost of construction was in this case admissible, (*Leonard* v. *Whitwill*, 19 Fed. Rep. 547,) the cost plainly is not of itself proof of her actual value at the time she was sunk. The ordinary and natural result of all such experimental building is that the final structure can be duplicated at a price far less than the cost of the original, built in that way. Full compensation for the loss, therefore, so far as respects the vessel, is not to be measured by what the dredge cost to build in that way, but by what it would cost to replace her. There is no direct testimony to this point, although one witness said her hull could be replaced for $10,-000 or $12,000; but the cross-examination showed that this estimate omitted some parts of the hull, and was not reliable. One of the libelant's chief representatives, familiar with the facts, stated, when visiting the vessel with a view to raising her, that she was worth about $40,000, and this estimate stands uncontradicted. It is repeated in the salvage record. The vouchers produced for her whole cost and outfit, including all changes, aggregate only about $44,000. The item of $16,180 for hull (Exhibit F.) should be, according to the bill of sale and check, $15,180. The libelant's witnesses did not testify what the vessel could be duplicated for, and, on being pressed to state her value, stated it only, "in connection with their business," at $50,000. Upon this evidence I think that, for a vessel built in the way the Queen was built, no higher value

should be adopted than $40,000, the value put upon her at the time of the loss. There is no reasonable probability, I think, that that estimate would be too low, or that the dredge could not have been duplicated for that sum.

2. *Loss of Profits.* The libelant claims additional damages to the amount of $16,583, for loss of profits under its dredging contract, which profits it claims might have been realized by the use of the Queen from September 6th to November 5th, *i. e.*, 57 days, at the rate of $292 per day. The testimony shows, however, that her profits during the whole 172 days that she was at work dredging were but about $142 per day, or less than half the sum claimed. No part of this claim, however, can, I think, be allowed, either upon precedent or upon principle; for the reason (1) that the Queen was not under any charter at the time of the loss, but was simply in use by the libelant, as any other fit vessel might have been used, in the execution of the dredging contract; and (2) because the dredging contract was not lost upon the loss of the Queen, but, so far as appears, was continued up to the point where the government had the right to treat the contract as completed, and there is no evidence that the work would not have been terminated by the government at the same point, had the Queen been kept at work; in other words, no profits are proved to have been lost.

Upon a total loss by collision, the ordinary rule of damages is the value of the vessel with her net freight upon the pending voyage, and interest from the time of its probable termination, had the loss not occurred. The net freight is allowed, because that loss is certain and reasonably ascertainable, and because it is the immediate result of the collision, and its necessary result, inasmuch as no other vessel could be had to supply the place of the vessel lost, and thus earn her freight by completing her voyage. If the vessel is only damaged, the amount allowed for demurrage or detention during necessary repairs is the value of the use. That value depends on the business in which she is engaged; and an existing charter is therefore competent evidence in determining the value of her use, or of the amount of the loss, if the charter be lost by the detention. Such a loss is not only certain and reasonably ascertainable in amount, but it is also a natural result of the collision, as distinguished from what is special or exceptional; since the chartering of vessels for a pending voyage, or for a subsequent one, is in the ordinary course of the shipping business. *The Gorgas*, 10 Ben. 666; *The Belgenland*, 36 Fed. Rep. 504; *The Argentino*, L. R. 13 Prob. Div. 61, 191, 197.

Compensation for the loss of a verbal charter for the season, embracing many subsequent trips, was indeed allowed by LOWELL, J., in the case of *The Freddie L. Porter*, 8 Fed. Rep. 170, affirming 5 Fed. Rep. 822. No other similar case in this country or in England is found. It was stated by LOWELL, J., to be "an advance upon the decisions." If such time charters are not special and exceptional, and not unusual in the ordinary course of business, then a loss of that kind would be "such a consequence as in the ordinary course of things would flow from the tortious act," and be therefore allowable on principle, if not too contin-

gent; otherwise not.    Mayne, Dam. (4th Ed.) 44; 2 Greenl. Ev. § 256; *The Argentino*, L. R. 13 Prob. Div. 197; *Smith* v. *Bolles*, 132 U. S. 125, 10 Sup. Ct. Rep. 39.    But, however that may be, there was in that case, at least, a charter of the particular vessel; and with the loss of the vessel the charter and its profits were necessarily lost, because no other vessel could be legally imposed on the charterer in order to complete the contract.    Here there was no charter.    Any fit vessel might have been supplied to take the place of the Queen.    The work was in fact continued by the other two dredges for nearly two months after the Queen was sunk; and still other dredges might have been employed, so far as appears, in continuing work under the libelant's contract, had that been desired.    This case does not differ in principle from the ordinary case of the loss of something for which the owner had useful and profitable employment, and there only the value is allowed; future earnings are not given.    If the hirer of a horse negligently causes its death, the owner recovers only the value of the horse, not the future profits that might have been realized by letting him out, however regular and ascertainable such profits might be.    The value is the equivalent of another horse, which the owner may buy and let out in place of the one lost.    See *Cutler* v. *James Goold Co.*, 43 Hun, 516.    It is the same with the Queen. The supreme court in the case of *The Amiable Nancy*, 3 Wheat. 546, 560, expressly rejected such profits in a maritime cause, allowing only the value, with interest.    STORY, J., there says: "This rule may not secure a complete indemnity for all possible injuries, but it has certainty and general applicability to recommend it, and in almost all cases will give a fair and just recompense."

Again, there is no proof that on this contract the libelant lost anything to which it had any certain right.    To be allowed, in any case, the profit claimed must be based upon some fixed and certain right, and not rest upon any mere discretion or contingency.    The libelant's contract was "to deepen Gedney's channel by the excavation of 320,000 more or less cubic yards."    After excavating about 304,000 cubic yards, and reaching a uniform depth of 26 feet, the government stopped the libelant's work.    The contract did not give any legal right to excavate the exact amount of 320,000 yards; and the termination of the contract by the government when nineteen-twentieths of that amount were excavated, and a uniform depth reached, amounted to a substantial fulfillment of the contract.    The gross sum payable for the remaining 16,000 cubic yards, even had the contract given the right to excavate that exact number of yards, would have amounted to but $8,640, and the average profit, according to the testimony, to about half that sum.    Had the Queen been at work, there is no evidence, and no legitimate inference, that the work would not have been stopped and the contract terminated by the government at the same point.    And on the other hand, had the libelant wished to proceed faster with the work after the loss of the Queen, nothing prevented the hiring of additional dredges in her place.

3. A further question arises as to the expense of raising the Queen. She was in Gedney's channel, and an obstruction to navigation, and

therefore required to be removed, and it was justifiable to attempt raising her with a view to repair. She was raised and removed by Messrs. Baxter & Chapman. Had the libelant necessarily incurred any legal charges in this work, it would be included in the damages. But I find that Messrs. Baxter & Chapman did their work of raising and removal upon a written contract, which provided, in substance, that they would raise the Queen if practicable, and bring her to a dock, "for a proportion of her value, to be agreed on between them and the libelant," or, if they were unable to raise her, to be paid "such sum for their services as might be recovered therefor by the libelant from the city of Alexandria." The Queen was raised, brought to a dock, and found unfit for repair; and, on being libeled for the salvage services, all her net proceeds were paid over to Baxter & Chapman. So far as this contract goes, it is evident that the libelant has incurred no liability or damage in the raising, and therefore can recover none. Baxter & Chapman contracted to look to the vessel alone for their pay, if they could raise her, which they did.

It is claimed, however, that after the written contract was signed it was modified by a verbal agreement that the libelant should pay $7,500 at all events. But this statement was afterwards changed by the witness so as to mean only in case that sum was recovered from the city of Alexandria. Both the Brainerds, with whom this modification was alleged to have been made, neither testify upon the subject, nor admit the alleged modification. They keep silence, and let Baxter & Chapman establish that claim if they can. But the other circumstances are such as to compel me to find against the alleged modification as extremely improbable and insufficiently proved. The written contract leaves no possible doubt that the controlling idea of the Messrs. Brainerd was to incur no further personal liability for the raising of the boat, and that Baxter & Chapman, for their pay, must look to the boat alone, if she could be raised; or, if not raised, then only to the city of Alexandria, and what could be got from her.

The work of raising was begun on the morning of September 12th. The contract is dated the 11th September, in the handwriting of the counsel employed, and the circumstances show that it could only have been concluded after 4 o'clock in the afternoon of the 11th, and after the return of all parties from visiting the wreck. The modification is alleged to have been made before the work was begun, i. e., before the 12th; so that this modification, if made at all, must have been made within two or three hours after the written contract was dated, signed, and delivered,—a modification, too, that directly reversed, as to responsibility, the whole object and scope of the written contract; and that without any further writing, or any recall or cancellation of the agreement just signed, or even any allusion to it. If the Brainerds had on oath confirmed this remarkable transaction it would have been difficult enough to believe it; to do so while they keep silence, even in their own suit, and in no way commit themselves to any such modification, or to any existing liability on their part, is impossible. Written evidence, moreover, would be of little value, if it could be avoided like this upon one-sided testimony,

and under such circumstances. I do not find any voucher showing payment by the libelant to Baxter & Chapman, beyond the proceeds of the Queen herself.

The record of the salvage suit in New Jersey, by increasing the inconsistencies in the evidence, and by its failure to show that the Brainerds ever agreed to incur any individual liability to Baxter & Chapman for raising the Queen, confirms my disbelief of any such modification of the written contract. In the absence of more convincing proof, the written contract should stand. The testimony as to alleged modification should be regarded as nothing more than the imperfect recollection of the witnesses of what may have been said in the course of the negotiations, but which was superseded by the written agreement as finally concluded late in the afternoon of September 11th. There are certain other expenses which the libelant incurred and paid after the Queen was raised, in order to ascertain whether she was worth repairing. Though I have some doubt as to the necessity of some of them, I allow, including interest to date, $1,418.50. The damages will be:

(1) Value of Queen and outfit, with interest from September 6,
1886, to date, - - - - - - - - $47,700 00
(2) Subsequent expenses and interest, - - - 1,418 50
                                                       ———————
Total, - - - - - - - - $49,118 50

The other exceptions are overruled.