NICHOLAS TRANSIT CO. v. PITTSBURGH S. S. CO.

(District Court, W. D. New York. April 20, 1912.)

1. EVIDENCE (§ 568*)—SUIT FOR COLLISION—EVIDENCE AS TO SPEED OF OVERTAKING VESSEL.

While it is a general rule that the testimony of witnesses on board a vessel as to what took place thereon is entitled to more weight than the testimony of witnesses on other boats, yet the testimony of the officers of an overtaken vessel, who are experienced navigators and know the speed of their own vessel, as to the speed of the overtaking vessel, is entitled to consideration.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2392-2394; Dec. Dig. § 568.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. COLLISION (§§ 52, 51*)—OVERTAKING VESSELS—RULES GOVERNING.

Under rule 20 of the navigation rules for the Great Lakes (Act Feb. 8, 1895, c. 64, 28 Stat. 645 [U. S. Comp. St. 1901, p. 2891]), a vessel which has assented to the passing of an overtaking vessel is bound to keep her course and speed, but by rule 22 the overtaking vessel is required to keep out of the way, and to run at moderate speed in order to reduce the size of her displacement waves and the danger from her suction, especially in narrow channels.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 62, 57–61; Dec. Dig. §§ 52, 51.*

Collision by overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

3. COLLISION (§ 51*)—OVERTAKING VESSELS—EFFECT OF DISPLACEMENT WAVES.

The theory that the displacement waves of a large vessel when passing a smaller may cause the latter to sheer is recognized in the admiralty law of this country, and imposes upon the larger vessel when overtaking the smaller the duty of keeping at such a distance as to avoid the effect of such force.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 57–61; Dec. Dig. § 51.*]

4. COLLISION (§ 66*)—OVERTAKING VESSELS—FAULT OF OVERTAKING STEAMER.

A collision in the Detroit river between the steamer Glidden, passing up and the overtaking steamer Princeton held on the evidence due solely to the fault of the Princeton, which was much the larger vessel, in failing to keep out of the way, and in navigating at such high speed and so close to the Glidden as to cause the latter to sheer.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 84; Dec. Dig. § 66.*]

In Admiralty. Suit by the Nicholas Transit Company, as owner of the steamer John N. Glidden, against the Pittsburgh Steamship Company, as owner of the steamer Princeton. Decree for libelant.

Goulder, Holding & Masten (Harvey D. Goulder and Frank S. Masten, of counsel), for libelant.

Hoyt, Dustin, Kelley, McKeehan & Andrews (Hermon A. Kelley and George W. Cottrell, of counsel), for respondent.

HAZEL, District Judge. The libel was filed to recover for damages incurred at about half an hour after midnight on October 15, 1902, by the steamer John N. Glidden in a collision with the propeller Princeton, one of the large steamers of the Great Lakes, in the Detroit river at a locality known as Ballard's Reef channel. Both steamers were going upstream, the Glidden, from Sandusky to Duluth, heavily laden with coal, the Princeton, from Lake Erie to Lake Superior, without cargo, but carrying a water ballast aft and none in her forward compartment. The Princeton's draught was 14½ feet aft, and nothing forward, her forefoot being raised out of the water and her bow striking the surface of the water at her keel. She was 475 feet long; keel, 454 feet; beam, 50 feet. The Glidden was 222 feet in length; beam, 35 feet; and loaded to the depth of 16 feet, nearly her full draught. She was the colliding vessel. The Detroit river at the point of collision was about one mile wide, while the channel in which the steamers were navigating was 300 feet wide, and was marked on the east side with three gas buoys. There was a

current of between one and two miles an hour. The night was dark and clear, the moon shining, and there was no wind.

The Glidden was ahead, and first sighted the masthead light and the red and green lights of the Princeton as the latter came over the Lime Kiln crossing, about a mile below. On passing a tow she checked down to between four and five miles an hour over the land, and while proceeding a little westward of the Malden Ranges, headed on the upper gas buoy, there came to her a one-blast signal from the Princeton, which was then about a half mile astern, requesting permission to pass on her starboard side. Her first mate, Cuthbert, who was on the pilot house, having just before relieved Capt. Smith, deemed it unsafe for the Princeton to pass at this point in the channel on account of her high speed, and answered by blowing three whistles, indicating his desire that she slow down. This indication was thoroughly understood by the Princeton which responded by checking down, and after an interval of about a minute again signified, by appropriate signal, her desire to pass. The Glidden, which had meanwhile starboarded her helm and straightened up on a course about 50 feet from the west side of the channel, keeping the Malden Ranges open to the westward of her course, then answered an assent to the second passing signal. The Princeton rapidly approached, and, when her stem reached a point abreast of the boiler house of the overtaken steamer, the latter suddenly deviated from her course, and headed across the channel in the direction of the Princeton. The first mate promptly directed the wheelsman, McFern, to starboard and to hard astarboard, in order to swing the imperiled steamer to port, and, though the order was promptly obeyed and was promptly responded to by her helm, the Glidden nevertheless sheered into the Princeton, and the two vessels collided at the bluff of their bows at an angle of about two points. The force of the impact rolled the bow of the Glidden to port, while that of the Princeton was swung around towards the invisible bank, bringing her almost in range with the gas buoys which marked the east boundary of the channel. The Glidden had not altered her speed of between four and five miles an hour.

The witnesses are in conflict as to the rate of speed at which the overtaking vessel was navigating; it being variously estimated at from 6 to 12 miles an hour. Her officers, and such of the crew as testified on the point, say that after slowing down she went at a rate of from 7 to 7½ miles an hour. Her engineer on watch swore that, when the Princeton was near the Malden Ranges, he received a chadburn signal to slow down from full speed—12 miles an hour—to half speed, and that, after running for about 10 minutes, he was signalled to stop, and directly afterwards felt the jar of the collision. He was unable to state how rapidly she was then running, or how long it would take after slowing down from full speed to make an appreciable reduction. Five witnesses, including her master, have, however, sworn that the Princeton's speed was not in excess of 7½ miles an hour past the land; while to the contrary, two witnesses for the Glidden—her master and first mate—say that the Princeton was coming at about 12 miles an hour. Upon the truthfulness of the testimony as to her speed and the lateral distance of the Princeton from the Glidden when

they lapped depends largely the question of her asserted negligence, though, of course, aside from this there is the broader question as to whether she was not primarily at fault for passing the Glidden in such a way as to originate by her swell the disastrous sheer which precipitated the collision.

[1] The respondent invokes the rule that the testimony of witnesses who were aboard a vessel and who swear as to what actually occurred thereon is entitled to more weight than is the testimony of witnesses on other boats who form estimates merely from observation. Such rule, without doubt, is an excellent guide for the ascertainment of particular occurrences, but, not unlike other rules of evidence, it has limitations, and of necessity such testimony must be considered with the elicited facts and circumstances and the probabilities arising from the situation. The estimates of the Princeton's speed by the master and first mate of the Glidden were not those of novices, but were the estimates of skilled navigators who daily, during the season of navigation, observe the speed at which vessels pass one another, and therefore, in view of the closeness of the steamers when they lapped, should not be wholly ignored or discredited. Moreover, they knew the speed at which their vessel was proceeding through the water, saw the Princeton in the distance, and noticed her speed and lateral waves. Indeed, as bearing upon his observation as to her speed, it will be remembered that Cuthbert withheld consent to her passing because she was then coming too fast. It was but a short interval before the Princeton came abreast the Glidden's quarter, and the probabilities are not entirely unwarranted that her speed, though reduced from 12 miles an hour, was nevertheless too rapid for passing so close to the Glidden, which as the overtaken steamer had the right of way.

[2] It is true enough that, under rules 22 and 23 of the act regulating navigation on the Great Lakes and their connecting contributory waters, the Glidden was bound to keep her course and speed, but the overtaking steamer was also bound to keep out of her way. Her consent to the Princeton's passing on her starboard side in this locality cannot be construed as a modification or waiver of the burden placed upon the Princeton, as an overtaking vessel without tow, to run more slowly in order to reduce the size of her displacement waves and prevent suction, and to cautiously and properly navigate whenever there is a probability of imperiling the ahead vessel. This principle finds support in many adjudications. City of Paris, 9 Wall. 634, 19 L. Ed. 751; The Great Republic, 23 Wall. 20, 23 L. Ed. 55; Whitridge v. Joshua Dill, 23 How. 448, 16 L. Ed. 581; The C. H. Northam, Fed. Cas. No. 2,689. In the last-cited case Judge Benedict held that a steamboat passing a tow in a narrow channel without reducing her speed is liable if by her swell she injures the tow; that she is bound to know the depth of the water, the width of channel, and whether her swell will endanger the safety of other boats. As Ballard's Reef channel in which the collision occurred, though not a confined channel, was but 300 feet wide and about 21 feet deep, it is not improbable, in view of the proximity of the vessels and the large and powerful swell of the Princeton, that a rate of speed exceeding by two or three

miles that of the Glidden—a much smaller vessel and one heavily laden—interfered with her movements, and endangered her safety.

There is testimony for respondent tending to show that the distance between the two vessels was from 150 to 200 feet, that the Glidden was within 25 to 50 feet of the gas buoy, or close to the east bank and to the westward of the Princeton. Witnesses for the libelant, however—the master, mate, and two of the crew—testified that the distance apart was only from 40 to 55 feet. I am not prepared to accept as true this version as to the number of feet between the two courses, yet I am satisfied by the evidence that the lateral distance between the two vessels was much less than 150 feet. But, whatever the space may have been, the irrefragable inference in my judgment is that the swell or displacement wave of the Princeton was the primary cause of the Glidden's sheer, which she endeavored to overcome by an effort to keep her course, and to counteract the effect of her deflection by whatever cause it was produced, as was required of her in the exercise of due care. The Ohio, 91 Fed. 547, 33 C. C. A. 667; The Fontana, 119 Fed. 853, 56 C. C. A. 365.

There was much discussion on summing up as to whether the sheer was attributable to the suction or wave displacement of the Princeton. It was conceded that, if her suction caused the Glidden's divergence from her course, she was in fault for failing to take into consideration such force of the water, and to keep at a safe distance. Many expert witnesses testified that suction exerts itself only when the stern of one vessel passes the bow or stern of another, either in passing in opposite directions or in overtaking a vessel and passing her in the same direction; and that the tendency of suction or displacement waves is never to push the stern away and draw the bows together. Counsel for respondent in his brief explains that suction is generally caused by the propeller wheel which in its revolutions draws towards it the bow or stern of another vessel, passing in the same or opposite directions, and by the sudden rushing of the heaped-up waters between the boats towards the wake of the steamer causing the suction; and he contends that the theory of a bow wave or swell by which the collision is claimed to have been caused is entirely novel in admiralty, and has never before received serious consideration.

[3] There is no disinclination to disagree with the testimony defining suction, its subtle force and effect, and mode of operation or manifestation, but, nevertheless, libelant's claim as to the force of the Princeton's wave displacement is entitled to serious consideration. The proposition that damage may ensue to a vessel owing to the swell of another vessel does not involve a new problem. Marsden, Collisions at Sea (6th Ed.) 493; The Columbia, 61 Fed. 220, 9 C. C. A. 455; The Asbury Park (D. C.) 138 Fed. 925; The New Hampshire (D. C.) 88 Fed. 306. In Cadwell against The Ship C. F. Bielman, a libel for collision in the Toronto admiralty district, reported in 10 Exchequer Reports of Canada at page 155, the force of displacement waves of a large steamer when passing a smaller steamer on a course was clearly recognized, and it was there claimed, as here, that the force of the waves would push the stern of the smaller vessel away from the larger, and would bring their bows together. And the court

stated that in such a situation it was the duty of the overtaking steamer to pass at such a distance that no harm would result to the other vessel either from suction or displacement waves. Such, I conceive, is also the rule in this country.

[4] The mate Cuthbert, who had sailed the lakes 36 years, 19 years an officer, emphatically testified that from the time the Princeton lapped the Glidden amidships her swell came forcibly against the Glidden, and that, when she reached a point forward of amidships, the power of the swell was such as to throw the Glidden's stern off to port; that he had observed such influence manifesting itself many times. Capt. Smith was of a similar opinion, having made the same observations during the course of his experience. Capt. Boyce of the Princeton admitted that there might be an effect on a smaller boat from the waves of a larger boat, but denied that the repelling force would be sufficient to throw out the stern. A number of expert witnesses have corroborated the master of the Princeton in his view, and have testified that it would be impossible for any force to be exerted by the bow of one vessel upon any part of another vessel in passing; that the force of suction is exerted exclusively by the stern of a vessel; that they are not aware of any force of a bow wave exerted on an overtaken vessel in the manner claimed by libelant. I am left unpersuaded by these opinions and observations relating to the latter subject, and think that the fact that the Princeton was without draught forward, causing her to strike the surface of the water at her full width, gave additional force to her waves and swell.

Counsel for libelant in his brief has mathematically demonstrated that the force of the Princeton's wave was extraordinarily powerful. He assumes a conceded speed for the Princeton of not less than 7 or 7½ miles an hour, and deduces that her swell or displacement wave consisted of 4,500 tons of water, 2,250 tons moving to port and a like quantity to starboard. Assuming such calculations to be correct, the probability that an extraordinary wave force was exerted on the Glidden which it was beyond her power to withstand, and which was the direct cause of the accident, is not lacking in certitude.

The respondent, however, further contends that, aside from the questions heretofore discussed, the evidence clearly shows that the Glidden's sheer was entirely due to the difficulty in properly steering her and to her habit of sheering. The evidence establishes that she was steered by a hand steering device, and it was practically conceded that at times she steered with difficulty and took sheers which were hard to counteract; that she deflected from her course at times when there seemed to be no reason for so doing. But, however difficult it was, on occasion, to steer her, and though she was known to have frequently deviated from her course, and though her helm required watchfulness, she is not open, under the proofs herein as heretofore stated, to an accusation of a fault of this kind at the time of the collision in controversy. In Nicholas Transit Company v. Steamer Empire City and the Barge Magna, 196 Fed. 60, a case in which the Glidden was concerned, and in which the decision, though written just shortly prior to the present decision, is simultaneously filed, I substantially said that her predilection for sheering and the difficulty

in steering her were features which manifested themselves before she passed the Empire City and came into collision with the barge Magna in tow of the Empire City, a collision which culminated in the sinking of the Glidden and in her total abandonment by her owner. But in this case the proofs are that her sheer into the Princeton was not precipitated by any defects in her construction or steering device, or by any fault of navigation, or by any inherent tendencies to diverge from her course; but, on the contrary, the responsibility rests with the Princeton for her failure to navigate in the channel and to overtake the Glidden with that degree of care and caution which she was bound to exercise in order to avoid injuring the overtaken steamer.

The specific faults charged in the libel and supported by the evidence are that the Princeton, being the overtaking vessel, did not keep out of the Glidden's way; that her speed under the circumstances was excessive; that she was navigated so rapidly and so close to the Glidden as to deflect her from her course. As the Glidden was properly navigated and as efforts were promptly made by her to break the sheer, the Princeton alone must be held in fault A decree in libelant's favor, with costs, and reference to a commissioner to ascertain the damages, may be entered.