SHAVER TRANSP. CO. v. COLUMBIA CONTRACT CO. et al.

(District Court, D. Oregon. September, 1913.)

No. 5,420.

1. COLLISION (§ 105*)—TOWS MEETING—NARROW CHANNEL RULE.

A collision in the Columbia river at night between one of three stone barges made fast to a tug in the form of a spike tow and a meeting steamer also with a tow alongside *held*, on the evidence, due solely to the fault of the tug on the ground that she was on the wrong side of the channel, although the vessels had exchanged passing signals when half a mile apart and the channel was 2,500 feet wide at the point of collision.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 105.*]

2. COLLISION (§ 132*)—ACTION FOR DAMAGES—VALUATION OF VESSEL.

The measure of damages recoverable for the loss of a vessel sunk in collision considered.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 286; Dec. Dig. § 132.*]

In Admiralty. Suit by the Shaver Transportation Company against the steam tug Samson and three barges, Columbia Contract Company, claimant, and the Standard Oil Company. On final hearing. Decree for libelant against the libeled vessels. Dismissed as to Standard Oil Company.

For former opinion, see The Samson, 197 Fed. 1017.

Wood, Montague & Hunt, of Portland, Or., for libelant.

Rogers MacVeagh and Teal, Minor & Winfree, all of Portland, Or., for claimant.

Snow & McCamant and George B. Guthrie, all of Portland, Or., for respondent.

CUSHMAN, District Judge. Claimant relies on the following authorities: The Merchant Prince, Law Repts. (1892) 1 Prob. Div. 179, in Court of Appeal 1892; The Olympia, 61 Fed. 120, 9 C. C. A. 393 (C. C. A. 6th Cir. 1894); The F. W. Wheeler, 78 Fed. 824, 24 C. C. A. 353 (C. C. A. 6th Cir. 1897); The Ohio, 91 Fed. 547, 33 C. C. A. 667 (C. C. A. 6th Cir. 1898); The Fontana, 119 Fed. 853, 56 C. C. A. 365 (C. C. A. 6th Cir. 1903); The Edmund Moran, 180 Fed. 700, 104 C. C. A. 552 (C. C. A. 2d Cir. 1910); Nicholas Transit Co. v. Pittsburgh S. S. Co., 196 Fed. 65 (Dist. Ct. W. D. N. Y. 1912); The Lackawanna, 201 Fed. 773 (Dist. Ct. W. D. N. Y. 1913); Union S. S. Co. v. N. Y. & Va. S. S. Co., 65 U. S. (24 How.) 307, 16 L. Ed. 699 (U. S. Sup. Ct. 1861); The Bywell Castle, Law Repts., 4 Prob. Div. 219, in the Court of Appeal 1878; The Maggie J. Smith, 123 U. S. 349, 8 Sup. Ct. 159, 31 L. Ed. 175 (U. S. Sup. Ct. 1887); The Phoenix, 50 Fed. 330 (Dist. Ct. S. D. N. Y. 1892); The Lake Shore, 201 Fed. 449 (Dist. Ct. N. D. Ohio 1912); The Centurion, 100 Fed. 663, 40 C. C. A. 634 (C. C. A. 6th Cir. 1900); The Maria Martin v.

Northern Trans. Co., 79 U. S. (12 Wall.) 31, 20 L. Ed. 251 (U. S. Sup. Ct. 1871); The Columbia, 23 Blatchf. 268, 25 Fed. 844 (C. C. E. D. N. Y. 1885); W. Va. Central & P. Ry. Co. v. The Isle of Pines et al., 24 Fed. 498 (Dist. Ct. S. D. N. Y. 1885); The A. W. Thompson, 39 Fed. 115 (Dist. Ct. S. D. N. Y. 1889); The Louise, 52 Fed. 885, 3 C. C. A. 330 (C. C. A. 4th Cir. 1892); The Lisbonense, 53 Fed. 293, 3 C. C. A. 539 (C. C. A. 2d Cir. 1892); The George W. Childs, 67 Fed. 269 (Dist. Ct. E. D. Pa. 1895); The Victory, 68 Fed. 395, 15 C. C. A. 490 (C. C. A. 4th Cir. 1895); The Maryland, 182 Fed. 829 (Dist. Ct. E. D. Va. 1910); The Laura Lee, 24 Fed. 483 (Dist. Ct. E. D. La. 1885); The City of Alexandria, 40 Fed. 697 (Dist. Ct. S. D. N. Y. 1889); The Havilah, 50 Fed. 331, 1 C. C. A. 519 (C. C. A. 2d Cir. 1892); La Normandie, 58 Fed. 427, 7 C. C. A. 285 (C. C. A. 2d Cir. 1893); The James Gray v. The John Fraser, 62 U. S. (21 How.) 184, 16 L. Ed. 106 (U. S. Sup. Ct. 1859); The Sturgis v. Boyer, 65 U. S. (24 How.) 110, 16 L. Ed. 591 (U. S. Sup. Ct. 1860); The J. H. Gautier and The Herbert Manton, 5 Ben. 469, Fed. Cas. No. 7,319 (Dist. Ct. S. D. N. Y. 1872), affirmed 14 Blatchf. 37, Fed. Cas. No. 6,399 (C. C. S. D. N. Y. 1876); The John Cooker and The James W. Eaton, 10 Ben. 488, 13 Fed. Cas. 665, Fed. Cas. No. 7,337 (Dist. Ct. E. D. N. Y. 1879); The Doris Eckhoff, 32 Fed. 555 (Dist. Ct. S. D. N. Y. 1887); The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053 (U. S. Sup. Ct. 1897).

This question was before the court on the question of the right of libelant to maintain a suit for collision in rem against one of the vessels and in personam against the owners of another, charged to be involved in the collision. The Samson (D. C.) 197 Fed. 1017. The cause is now for decision, after evidence taken, and is brought to recover for the wreck of the steamer Henderson in a collision with the tow of the tug Samson; the collision occurring on the Columbia river between Astoria and Portland. The suit is in rem against the Samson and the three barges forming her tow and in personam against the Standard Oil Company; the owner of the oil barge being towed by the Henderson at the time she was struck.

[1] The collision took place between 1:30 and 2 a. m., July 22, 1911, in the main channel of the Columbia river, between Puget Island and the Oregon shore, near Bugby's Hole, during the flood season on the river, with a nine-foot tide at half ebb. The night was dark, but clear, with no moon.

The Henderson, a stern wheel steamer, 158 feet long, with a 31-foot beam, was coming upstream, lashed to the port quarter of her tow, overlapping the stern of her tow some hundred feet, and with her bow turned slightly in towards the tow. The oil barge was without propelling power of her own.

The tug Samson, 110 feet long, was going downstream with a tow of three scows, each about 150 feet long, 36-foot beam, and each loaded with about a thousand tons of rock. Her scows were arranged in what is known as a "spike" tow, one scow on her port quarter, another on her starboard quarter, and the third between the other two, projecting in front of them some 50 feet and immediately ahead of

the Samson; the port and starboard scows flaring from the center scow, making a flotilla, in general outline, not unlike the "club" upon a playing card.

The collision occurred upon the upper "reach" of an approximately straight stretch of channel, some three or more miles long. This stretch of channel was marked with certain range lights (two at the foot, on the Washington side, and one at the head of it, upon the Oregon shore) and is known as the "Hunting Island Range." At the place of the collision, the channel was about 2,500 feet wide. The Henderson and tow met and passed to starboard of the steamer Kern about two miles below the point of collision. The Samson rounded the point of Puget Island over a mile above the point of collision, thus coming into view from the Washington side of the river.

After sighting the Samson, while two miles apart, the oil barge, whose captain was directing her towing, whistled once, when the vessels were about a half mile apart, thus signaling passage port to port, or on the Oregon side of the Samson. The Samson answered promptly, accepting the signal. Both sets of vessels were properly equipped with lights.

From this point the testimony is conflicting and cannot be reconciled. The captain of the oil barge, considering the Samson was not complying with the signal with sufficient promptness, repeated it when the vessels were about 500 feet apart.

The situation, as stated, discloses that the point of collision, with reference to the width of the channel, is the controlling factor in determining who was responsible for the collision. For the libelant it is contended that this point was to the Oregon side of the range marks, and by the claimant that it was on the Puget Island side.

Much testimony has been introduced concerning the maneuvering of the vessels immediately preceding the collision; how the lights appeared from one upon the other; and the subsequent signals given by the boats as well as the handling of helms just before the collision. But none of it is of a character to shift or divide the responsibility for the relative position of the vessels with reference to the marked channel, after the giving of the first signal and its acceptance in ample time and with ample room to have avoided the collision, with the vessels involved under control.

It is probable that it was the port stone barge which struck and crushed the Henderson's port bow; a hole being made in her bow about 14 feet across and beginning about 35 feet back from her stem. That the Henderson was not struck further aft by the center stone barge is probably explained by the flare of the stone barges, the exact extent of which cannot be known; but whether the Henderson was struck by the center scow or the port scow is deemed unimportant, for the angle of the courses of the encountering vessels would have been substantially the same in either case.

The Henderson, when cut away and free from the oil barge, sank almost immediately and, without any control of her movements, drifted downstream. The oil barge dropped her anchors. The Sam-

son carried her tow astern of the oil barge after the collision, got the lines off the stone barges, and anchored them.

There is a great deal of conflict in the testimony of the witnesses upon the vessels concerned about how long a time elapsed after the collision before the oil barge dropped her anchors. Libelant contends that they were dropped immediately. The witnesses of libelant on the Henderson and oil barge are corroborated on this point and that of the place of collision by a number of drift net fishermen, who were on the river a short distance below the collision. These fishermen, in putting out their drift nets, used the range lights primarily marking the channel for the benefit of vessels.

The oil barge, when anchored, was within a short distance of the Oregon shore, with no more room than was required to swing at anchor. Claimant undertakes to account for her position upon the theory that she had such headway as to carry her upstream, across the range, and over to the Oregon shore. The fact that she was only making three miles an hour at the time of the collision, coupled with the further facts that it was ebb tide, with a strong current, that the Henderson had been backing full speed astern for half a minute before the collision, that the force of the collision was such as to break the five heavy lines fastening the Henderson to the oil barge, renders it improbable that she would go a quarter of the distance from the range to the Oregon shore even without dragging her anchors, whereas she was anchored three-quarters of the way in from the range towards that shore. This was an old and good anchorage ground. It is unlikely that the anchors dragged. The evidence shows that they were dropped in not to exceed 30 seconds after the collision; one anchor weighing 7,000 pounds and the other 6,300 pounds.

The stone barges were anchored to the Oregon side of but near the range. These stone scows were evidently carried thus far towards Puget Island after the collision before the lines of the Samson were gotten off them, then drifted down the channel to the point of anchorage. The momentum of the stone barges, going down the river at six or seven miles an hour, with a favorable current, would naturally carry them further towards the Washington shore than the oil barge would go towards the Oregon shore, traveling at the rate of three or four miles per hour, when struck, with an adverse current.

That the point of collision was well to the Oregon side of the channel is still further shown by the point to which the Henderson drifted. While it cannot be determined how great was the momentum of the oil barge or the stone scows, nor how far across the stream they would be carried by it, the crushing and immediate sinking of the Henderson left it inert to be carried by the current, uninfluenced by any other force. It drifted and lodged in the shoals on the shore of Tenas Illihee Island, which was upon the Oregon shore of the main channel of the river, about 3,500 feet below the point of collision.

The testimony of those aboard shows that the Henderson bumped on the bottom as she drifted, which could only have been upon the shoals to the Oregon side. Claimant seeks to explain the position in which the Henderson was left by contending that she was drawn to-

wards the Oregon side of the river by the waters of Clifton Channel, which separates Tenas Illihee Island from the main Oregon shore. The deepest parts of this channel are 12 to 15 feet, not one-third the depth of the main channel, and could have had no appreciable effect upon the Henderson unless she was well in towards the Oregon side when she was struck.

After anchoring her barges, the Samson and one of her boats went to the Henderson and shoved and pulled her upon the shoals of Tenas Illihee Island. The captain of the Samson testified that, in going to the relief of the Henderson, he crossed the range. Therefore it is clear that the Henderson could not have been on the Washington side, while the Samson, through her movement and that of her stone barges, subsequent to the collision, might have been.

It is contended by claimant that it is by this action on the part of the Samson in towing and shoving the Henderson that she was gotten over to the Oregon side of the river. But it cannot thus be accounted for. The Henderson would not drift across the main current, and if in the center of the main current of the river, marked by the range lights, she would have drifted further down in the time required by the Samson to get her lines off her tows, anchor them, and go to the Henderson. If the Samson had found her upon the Washington side of the channel, she would probably have towed her to that shore and not to the Oregon side, across the deep channel, taking the chances of her sinking.

It is clear that the fault was with the Samson. The failure of the oil barge or the Henderson to give a danger signal, as provided by rule 1 prescribed for pilots in inland waters, and the repeating of the oil barge's first signal are not shown, by the evidence, to have helped to cause the collision. The pilot of the Samson understood the first signal and had his tow under control. If it was unwieldly, he should have known it and acted in time. The giving of a danger signal would not, in any event, have avoided the collision, because it would not have helped him control his tow, if unwieldy.

Having concluded that the sole fault was that of the Samson the supplemental libel against the Standard Oil Company, the owner of the oil barge, whose captain was in charge of her towing up the river, will be dismissed. The relief asked by the answer, in the nature of a cross-libel against libelant and the respondent Standard Oil Company, is also dismissed for the same reason.

It has already been held herein that the three stone barges would be responsible with the Samson for any damage from the latter's fault. The John Cooker, Fed. Cas. No. 7,337. In view of the fact that the Samson and the stone barges were both owned and claimed by the present claimant, taken in connection with other circumstances of the case, the court must adhere to the former ruling.

[2] The Henderson was raised, brought into the dry dock, and practically rebuilt. There was salvage of a portion of her machinery. Therefore the value of the Henderson, less the net salvage, is the measure of libelant's damage.

There is a wide range in the testimony as to the value of the Henderson; the amounts varying from $20,000 to $45,000, in the opinion of the different witnesses. The evidence shows that, at the time of the wreck, the Henderson was ten years old and in good condition. There is evidence by her builder that the Henderson and her equipment cost upwards to $51,000; that in 1911 labor and material were higher than in 1901, when she was built. Some of the witnesses testified that there had been an advance of 25 per cent. She was built as a passenger and freight boat, but, owing to the extension of railroad lines or other reasons, it appears that she had ceased to be of use in the passenger service.

A number of the witnesses who have testified as to the value of the Henderson have made lump valuations. Capt. J. H. Johnson, who built the Henderson, and whom the evidence shows to have been a man of much experience in building boats, went greatly into detail in his estimate of the cost and depreciation of the Henderson, placed the value of the Henderson at the time of the wreck at $43,888.21. The testimony of this witness has been accorded great weight, yet it does not appear that sufficient allowance has been made in his estimate for depreciation during the ten years the Henderson was in use. Among the items affected are: The painting, house, boilers, engines, furniture, and other minor items. The testimony of this witness shows, in estimating the depreciation, he took into consideration the present efficiency alone, without regard to the probable length of life of the articles valued, fixing the depreciation as low as 2 per cent. on one item; his contention being that the depreciation might be considered as resembling the quadrant of a circle, while at the last the falling off would be rapid—a perpendicular drop. At the beginning, for a considerable period, it would be very little below the high level of the article when new. It is concluded that this witness, in disregarding, in his estimate of value, the relation borne by the first cost to the probable length of life of the different items, placed the valuation $5,000 too high. The total value is therefore fixed at $38,888.21.

The gross value of the salvage is found to be $16,835. There is a dispute concerning the amount that should be charged against this on account of the cost of salvage. The work of salving was done by other of libelant's boats. It is contended that more boats than were necessary engaged in this work and that too great a charge has been made for them. It is not probable that more men or boats were used during a busy season than appeared necessary, merely for the purpose of seeking recovery at the end of a long lawsuit. The evidence fails to disclose that any of them were unnecessary. While the amount charged for the boats appears high, as compared with their ordinary employment, yet, when considered that the need was immediate and urgent, that libelant had to interrupt other employments in which the boats were engaged, to secure their services, the charge does not appear excessive.

The cost of salvage is found to be $8,414.84, from which should be deducted $100, which was afterwards realized on certain timbers used in the salvage work, making $8,314.84. The net value of the salvage

from the vessel is therefore found to be $8,520.16. Deducting this from $38,888.21, the value of the Henderson as found, there would remain $30,368.05, the amount of libelant's damage occasioned by the loss of the Henderson. To this should be added the value of the supplies and provisions aboard the Henderson at the time of the wreck, $418.71 and $83.99, respectively, making the total recovery to which libelant is entitled $30,870.75, with interest at the legal rate from July 22, 1911. Libelant to recover costs. The costs of respondent Standard Oil Company to be divided equally between libelant and claimant.